698 A.2d 1167

**COMMERCIAL UNION INSURANCE COMPANY,**

**v.**

**PORTER HAYDEN COMPANY.**

**No. 1493, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Aug. 29, 1997.

606

608

**610**

612

614

Theodore A. Howard (Richard A. Ifft, Paul G. Roche and Rosenman & Colin, L.L.P., on the brief), Washington, D.C., for Appellant.

Lisa A. Kershner and Dwight W. Stone, II (Louis G. Close, Jr. and Whiteford, Taylor & Preston, L.L.P., on the brief), Baltimore, for Appellee.

Argued before MURPHY, C.J., and MOYLAN and EYLER, JJ.

MOYLAN, Judge.

This litigation has a tortured history and it is our earnest desire to see it resolved as expeditiously as possible. The appellee is the Porter Hayden Company ("Porter Hayden").[1] The litigation is an action for declaratory judgment brought by Porter Hayden to determine its insurance coverage. The

---

1. Porter Hayden is a Maryland Corporation. It was formed in 1966 as a result of a merger between H.W. Porter & Company, Inc., a New Jersey corporation, and Reid Hayden, Inc., a Maryland corporation. Because certain events considered in this opinion pre-date the 1966 merger, our use of the term "Porter Hayden" will refer either to the present company or to its predecessors, as appropriate.

appellant is the Commercial Union Insurance Company ("Commercial Union").[2]

Porter Hayden has been since the 1920's an insulation contractor in the business of selling and installing insulation at various facilities in the mid-Atlantic area. One of those facilities was the Bethlehem Steel plant at Sparrows Point. Until some time in the 1970's, Porter Hayden's insulation products contained asbestos.

### *Procedural Background*

From August of 1976, when the first asbestos-related claim was filed against Porter Hayden, through September 21, 1990, when the declaratory judgment action that is the subject of the present appeal was filed, "thousands of lawsuits [were] brought against Porter Hayden Company by claimants who alleged bodily injury or death caused by the installation operations of the Porter Hayden companies at various industrial or construction sites" in Maryland, Virginia, New Jersey, North Carolina, and other jurisdictions. Although the declaratory judgment action literally sought formal relief with respect to only five such claims, the request for the declaration as to the coverage, in spelling out the possibly broader repercussions of the action, also referred to "numerous other claimants [who] have filed and will file similar actions against Porter Hayden." The declaration of coverage with respect to those five claims will, therefore, inevitably guide the disposition of numerous others as well. The case now before us does not concern the ultimate merits of any of those claims. It deals exclusively with the extent to which Porter Hayden enjoys insurance liability coverage from Commercial Union.

When the first claims against it were filed, Porter Hayden directed its comprehensive general liability (CGL) insurer, the Hartford Accident and Indemnity Company, to give notice of

---

**2.** Commercial Union, a Massachusetts corporation, is the successor corporation to the Employers' Liability Assurance Corporation (ELAC). In this opinion, we will use "Commercial Union" to refer to either the present corporation or its predecessor, as appropriate.

the claims to various other liability insurers that were "properly chargeable with the defense under [their] policy obligations." Commercial Union first received actual notice of pending asbestos-related lawsuits against Porter Hayden in early August of 1978, when it was asked by Employers' Insurance of Wausau, another of Porter Hayden's insurers, to acknowledge that it was obligated under its policy to provide coverage for claims of alleged exposure during pertinent policy periods. From the outset, Commercial Union denied any obligation to defend or to indemnify Porter Hayden for asbestos-related liability.

Before the issue of coverage between Commercial Union and Porter Hayden could be finally resolved, however, the dispute lapsed into a state of suspended animation for almost a decade. In July of 1982, the Hartford Accident and Indemnity Company, as one of Porter Hayden's insurance carriers, filed a declaratory judgment action against Porter Hayden and against Porter Hayden's other primary carriers, including Commercial Union. Before that case went to trial, however, all of the parties, including Commercial Union, entered into an "Agreement" (the "Hartford Agreement") as of November 1, 1982, by which they agreed to participate, on a shared basis, in the defense of all pending and anticipated asbestos-related claims. During the pendency of the Hartford Agreement, the parties further agreed to repeated extensions. With respect to Commercial Union and Porter Hayden, the agreement between them, as part of the larger Hartford Agreement, expired on December 31, 1986.

When, therefore, five new asbestos-related claims were filed against Porter Hayden in 1987, the dispute over coverage flared anew. Those were not pre–1987 claims and were not, therefore, covered by the Hartford Agreement. Each of those claims, moreover, was filed in the Circuit Court for Baltimore City. On August 31, 1987, Porter Hayden forwarded the five new cases to Commercial Union for defense and handling. On September 21, 1987, Commercial Union denied coverage with respect to them.

The present litigation commenced exactly three years later, on September 21, 1990, when Porter Hayden instituted a declaratory judgment action against Commercial Union in the Circuit Court for Baltimore City. It sought a declaration of the duty of Commercial Union to defend and potentially to indemnify Porter Hayden with respect to 1) the five claims filed against Porter Hayden in August of 1987 and 2) "such other personal injury cases" filed against Porter Hayden "which may be tendered" to Commercial Union, expressly excluding, however, all cases filed before January 1, 1987 (and covered, therefore, by the Hartford Agreement). Approximately one year later, both parties sought various partial and total summary judgments with respect to certain issues in the case. Both parties duly filed oppositions to the opponent's motions for summary judgment and, in turn, replies to the respective oppositions. Hearings were held before Judge Hilary D. Caplan during January of 1992. After full discovery, briefing, oral argument, and a limited evidentiary hearing with respect to one of the issues, Judge Caplan, on February 14, 1992, issued a series of decisions and orders, purporting to resolve the dispute over coverage in favor of Porter Hayden. After a modification of two of the rulings and an ostensible reduction of the orders to final judgment on March 12, 1992, Commercial Union appealed to this Court.

Although a number of issues were raised before us on appeal and cross-appeal, we found it unnecessary in *Commercial Union Ins. Co. v. Porter Hayden Co.*, 97 Md.App. 442, 630 A.2d 261 (1993), to deal with more than one of them. That issue concerned the timely notice of occurrence from the insured to the insurer. The resolution of that issue hinged on the choice of law between Maryland and New York. We held that Judge Caplan had been wrong in applying Maryland law to the dispute. We held that under the law of *lex loci contractus* and in the absence of *renvoi*,[3] New York substan-

---

**3.** The subtleties of this arcane subject will be explored more fully when we move beyond this procedural overview to a more detailed analysis of the individual issues in the case.

tive law controlled the case and that, applying New York law, Porter Hayden had failed to give timely notice to Commercial Union as required by the policies. We reversed Judge Caplan's denial of summary judgment in favor of Commercial Union on that issue. As a result of our holding on that issue, "we need[ed] not, and [did] not, reach the other issues posed by the parties." 97 Md.App. at 470, 630 A.2d 261.

Porter Hayden applied for *certiorari* to the Court of Appeals, which was granted on December 21, 1993. The Court of Appeals vacated the judgment of this Court and ordered that the appeal be dismissed for the reason that there was no appealable final judgment under Maryland Rule 2–602(a), which provides:

Except as provided in section (b) of this Rule, *an order or other form of decision, however designated, that adjudicates fewer than all of the claims in an action* (whether raised by original claim, counterclaim, cross-claim, or third-party claim), *or that adjudicates less than an entire claim,* or that adjudicates the rights and liabilities of fewer than all the parties to the action:

(1) *is not a final judgment;*

(2) does not terminate the action as to any of the claims or any of the parties; and

(3) is subject to revision at any time before the entry of a judgment that adjudicates all of the claims by and against all of the parties.

(Emphasis supplied). *Porter Hayden Co. v. Commercial Union Ins. Co.,* 339 Md. 150, 661 A.2d 691 (1995). The case was remanded to the Circuit Court for Baltimore City for further proceedings.

The case on remand was assigned to Judge Edward J. Angeletti, Judge Caplan's having retired from the court in the interim. At a scheduling conference on September 27, 1995, Judge Angeletti decided that a jury trial was required on one unresolved issue involving disputed facts but that his adoption of the earlier legal rulings of Judge Caplan as his own would suffice to permit him to settle all other issues. The necessary

jury trial was conducted from January 3 to January 17, 1996. Following hearings on various post-trial motions, Judge Angeletti granted Porter Hayden's Motion for Entry of Final Judgment on May 7, 1996. In order to correct certain typographical errors, an Amended Order granting Porter Hayden's Motion for Entry of Final Judgment was issued on May 13. Commercial Union has appealed from that final judgment. On several limited issues, Porter Hayden has cross-appealed.

## Commercial Union's Basic Contentions

Deferring for the moment Commercial Union's contentions with respect to several allegedly erroneous post-trial rulings and also deferring for the moment the two contentions raised by Porter Hayden on its cross-appeal, we will first address the five primary contentions raised by Commercial Union by way of challenging the basic propriety of the declaratory judgment in favor of Porter Hayden. Commercial Union contends:

1) that Judge Angeletti erroneously refused to conduct further evidentiary proceedings, as mandated by the Court of Appeals in *Porter Hayden v. Commercial Union,* 339 Md. 150, 661 A.2d 691 (1995), with respect to three of the defenses asserted by Commercial Union;

2) that at the jury trial on the issue of the "missing policies," two prejudicial errors were committed;

3) that the present action was barred by the Statute of Limitations;

4) that Porter Hayden was, as a matter of law, barred from seeking recovery because of its failure to have given Commercial Union, as required by the policies, timely "notice of occurrence"; and

5) that recovery was barred because Porter Hayden had under the pertinent policies no coverage for hazardous products.

The latter four of these contentions deal respectively with the four specific defenses that Commercial Union had originally asserted before Judge Caplan, three by way of motions for summary judgment and one by way of a motion for partial

summary judgment. The first contention, however, is far more sweeping. In one sense, it involves the merits of contentions 3, 4, and 5. It claims that Judge Angeletti committed error in adopting as his own the earlier rulings of law of Judge Caplan and then in using those rulings as the basis for the summary rejection of Commercial Union's three separate defenses based on 1) the Statute of Limitations, 2) the lack of timely notice, and 3) the lack of coverage of hazardous products.

The overarching thrust of the first contention, however, is that there remained genuine disputes as to material facts involving each of those three specific defenses and that it was, therefore, error to have resolved any of those issues against Commercial Union without first conducting further evidentiary hearings. To the extent to which that blanket contention implicates the merits of the ultimate declaratory judgment, we will examine the question of whether further evidentiary hearings were required, not as an independent collective contention, but in more particular context as we examine, respectively, Commercial Union's third, fourth, and fifth contentions.

In another sense, however, the first contention raises a specter of a more ominous character. Inevitably the contention raises the question of whether the judgment that is now the subject of this appeal is infected with the same fatal virus of non-finality that doomed the earlier appeal to dismissal. Commercial Union argues that the Court of Appeals had held unequivocally that the viability of those three defenses had not been finally resolved by Judge Caplan and that the Court of Appeals's holding *ipso facto* meant that those still open issues required *further evidentiary proceedings.* Commercial Union's argument is that that which was non-final before has still not been finalized.

■ Before going forward with the merits of the present appeal, therefore, it behooves us to examine the threshold question of whether, indeed, we now have before us an appeal-

able final judgment as required by Maryland Rule 2–602(a).[4]

### *The Finality of the Judgment Now Being Appealed*

The basic contention of Porter Hayden is that it enjoyed liability coverage for asbestos-related injuries as a result of eleven consecutive one-year policies issued to it by Commercial Union, each running from November 25 of a particular year through November 24 of the succeeding year. The overall period allegedly covered by the eleven policies was from November 25, 1941 through November 24, 1952.[5]

Porter Hayden, however, could only produce copies of two of the policies, one running from November 25, 1948 through November 24, 1949 and the second running from November 25, 1949 through November 24, 1950. These will be referred to as the "extant policies." Porter Hayden also offered, however, circumstantial evidence to establish that the other nine policies [6] had been issued to it by Commercial Union and that the substantive content of the "missing policies" was substantially the same as that of the extant policies.

The first allegedly final judgment in this case and the subject matter of the first appeal arose from the series of rulings that Judge Caplan made on February 14, 1992 as those rulings were modified and finalized as of March 12, 1992. Judge Caplan had before him and he ruled on five separate

---

**4.** The argument that Commercial Union now makes in this regard is one it initially made in a Motion to Dismiss the appeal, supported by a 25-page Memorandum, filed with this Court on August 26, 1996. We summarily denied the Motion on August 29. It is appropriate that we now discuss in some detail the merits of that denial.

**5.** In addition to this eleven-year coverage, Porter Hayden also alleged coverage for the sixty-day period from November 24, 1952 through January 24, 1953 under a "stub" policy.

**6.** To be precise, whenever we refer to the nine "missing policies," we intend for that "missing" category to include as well the "stub" policy covering the sixty-day period from November 24, 1952 through January 24, 1953. Our use of the number "nine," therefore, may be taken by the literal-minded actually to mean "nine and one-sixth" or even "ten." Everything we say and hold is intended to cover the "stub" policy as well as all other policies.

motions for summary judgment. One of them was a motion for partial summary judgment filed by Porter Hayden. That Motion was granted. The other four motions were all filed by Commercial Union. One was a motion for partial summary judgment. The other three were motions for plenary summary judgment. All four of Commercial Union's motions were denied.

Porter Hayden's motion, which was granted, dealt only with the two extant policies. As Judge Eldridge pointed out for the Court of Appeals, 339 Md. at 154, 661 A.2d 691, "Porter Hayden's motion for partial summary judgment raised no issues relating to coverage under the missing policies." It sought only a declaration that under the two extant policies, Commercial Union owed Porter Hayden a duty to defend and potentially to indemnify. Judge Caplan granted that motion and appropriately issued a declaration to that effect.

Because Porter Hayden's request for declaratory judgment had asked for a declaration with respect to all eleven policies, however, the partial summary judgment with respect to only two of them obviously left the status of the coverage under the other nine policies completely unresolved. "[T]he trial court's declaration of Porter Hayden's right to coverage, even in light of the March 12 modifications, had been expressly limited to its rights under the 1948–1949 and 1949–1950 policies." 339 Md. at 159, 661 A.2d 691. The Court of Appeals further pointed out, 339 Md. at 162, 661 A.2d 691:

> In its complaint, ... Porter Hayden had asked the trial court for a declaratory judgment with respect to all of the policies of insurance allegedly issued by Commercial Union to Porter Hayden, including the "missing policies." *Thus, the trial court's declaration with respect to the two policies of insurance covering the years 1948–1949 and 1949–1950 resolved only part of Porter Hayden's action.*

(Emphasis supplied).

Conversely, Commercial Union's motion for partial summary judgment did not even purport to deal in any way with the extant policies. It challenged neither their existence nor

their coverage. It sought only a declaration with respect to the impossibility of proof of the nine missing policies. It, in effect, asked Judge Caplan to declare that under the "Best Evidence Rule," secondary evidence would be both inadmissible and insufficient, as a matter of law, to establish either the existence or the terms of the missing policies and that no claim for coverage, therefore, could successfully be prosecuted on the basis of them. That motion was denied. The Court of Appeals characterized the reason for the denial: "[T]he circuit court held that Porter Hayden had produced sufficient evidence of the existence and terms of the missing policies so as to require a denial of Commercial Union's summary judgment motion with respect to those policies." 339 Md. at 156, 661 A.2d 691. Although the Court of Appeals spoke of the still unresolved issues in the plural, its primary focus was clearly on that still open issue of the existence and the content of the nine missing policies:

It is apparent that the orders entered by the circuit court in the present case did not finally dispose of the action. *In particular, numerous issues appear to be open with respect to the missing policies.*

339 Md. at 165, 661 A.2d 691 (Emphasis supplied). The very existence of the missing policies and, should they be proved to have existed, the coverage provided by them were classically material facts as to which there was a genuine dispute. Although neither the existence nor the contents of the missing policies had yet been proved, those facts were held by the Court of Appeals to be capable of proof and, therefore, deserving of a trial before a fact finder.

On remand, there was, as mandated, a full evidentiary hearing with respect to those disputed facts, and a jury duly rendered its verdicts on those questions. It found that the nine missing policies had indeed been issued to Porter Hayden by Commercial Union. It further found that those missing policies had provided substantially the same coverage as had been provided by the extant policies. That issue has been finally resolved and now presents no impediment in terms of appealability.

The question, rather, is whether there were other issues that required either a further evidentiary hearing or something else that would amount to a final resolution. If the latter, then was there something else by way of further and final resolution? Our focus in this regard turns to the three defensive issues that Commercial Union raised before Judge Caplan in three separate and plenary motions for summary judgment. Had any one of them been granted, it would have been a complete defense to the suit and, therefore, an appealable final judgment. All three motions were, however, denied.

Commercial Union sought by those motions to establish 1) that Porter Hayden's request for a declaratory judgment was barred by the Maryland Statute of Limitations; 2) that Porter Hayden had failed to give Commercial Union timely notice of the "occurrences" as required by the policies, thereby disentitling it to coverage; and 3) that the claims against Porter Hayden all involved "products hazard" coverage which Porter Hayden did not enjoy. (Even though the existence and contents of the missing policies had not yet been proved, it was agreed that Porter Hayden enjoyed, at most, "premises operation" coverage and not "hazardous products" coverage.) The Court of Appeals referred to those three issues that had been raised but had not yet been finally resolved:

> [T]hree of Commercial Union's motions for summary judgment did seek relief which would have disposed of the entire action before the court. In each summary judgment motion, Commercial Union sought a declaration that it had no obligation, under any policy of insurance, to defend or indemnify Porter Hayden in any asbestos-related litigation, regardless of when suit was filed. The trial court, however, denied Commercial Union's motions for summary judgment.

339 Md. at 163–64, 661 A.2d 691.

Because each of the defenses asserted in those three motions applied to the extant policies and the missing policies alike, judgment would have been final in Commercial Union's favor had any one of them been granted. None, however, was granted. The denial of the motions, by contrast, presents a very different picture in terms of finality. The Court of

Appeals pointed out, 339 Md. at 164, 661 A.2d 691, that "it is well settled in Maryland that the denial of a motion for summary judgment is ordinarily not a final judgment from which an appeal may be taken." *See also Lawrence v. State Dept. of Health,* 247 Md. 367, 371, 231 A.2d 46 (1967); *Merchants Mortg. Co. v. Lubow,* 275 Md. 208, 212, 339 A.2d 664 (1975); *cf. Biro v. Schombert,* 285 Md. 290, 295, 402 A.2d 71 (1979). As Judge Rosalyn Bell explained for this Court in *Ralkey v. Minnesota Mining and Mfg. Co.,* 63 Md.App. 515, 523, 492 A.2d 1358 (1985):

> [A] denial of a motion for summary judgment does not "finally dispose" of any matter—it merely permits the case to proceed based on the finding that a dispute concerning a material fact exists. The denial neither decides any issues of law nor precludes a subsequent finding that no factual disputes exist.

Because Commercial Union's motions were denied, there self-evidently was no judgment in Commercial Union's favor to the effect that any of the three defenses was necessarily valid, as a matter of law. The denial of validity, as a matter of law, does not, however, establish invalidity, as a matter of law. To be sure, the granting of partial summary judgment in Porter Hayden's favor with respect to the two extant policies necessarily embraced subjudgments that all three of Commercial Union's defenses were invalid with respect to claims arising under those two policies. Because that partial summary judgment in Porter Hayden's favor did not even purport to cover claims under the nine missing policies, however, there could have been no final judgment with respect to the invalidity of the defenses in cases under the missing policies. At the conclusion of the hearings before Judge Caplan *in 1992,* therefore, *those questions were still unresolved.*

In pursuing its argument that non-finality at that time necessarily equates to non-finality at this time, Commercial Union is being disingenuously opportunistic. Once the Court of Appeals determined that one factually unresolved issue—that concerning the missing policies—mandated a dismissal of the appeal, it dealt with the other unresolved issues in the

case far more summarily. It did not examine in any detail the reasons given by Judge Caplan for denying Commercial Union's three motions for total summary judgment. After pointing out the general proposition that denials of motions for summary judgment are not appealable final judgments, it simply made the observation:

> The circuit court's denial of Commercial Union's motions for summary judgment in the present case did not terminate the litigation or prevent Commercial Union from further defending its case. Rather, the trial court's decisions merely reflected its determination that the issues presented in the motions should be resolved at trial.

339 Md. at 164, 661 A.2d 691.

From the general directive of the Court of Appeals that a *remand to the trial court* was necessary so that unresolved issues could be finally resolved, Commercial Union makes the invalid leap of logic that such a directive necessarily means that there must be *further fact finding.* That, of course, is not necessarily the case. On a remand to a trial court, the previously unresolved, to be sure, may sometimes be resolved by the fact finder; on other occasions, by contrast, it may be resolved by the judge without any resort to further fact finding.

### A. Denial of Summary Judgment # 1: Genuine Dispute of Material Fact

In terms of its significance, a denial of summary judgment is Hydra-headed. It may represent any one of three possibilities, only one of which would necessarily involve further fact finding. The garden variety reason for denying a motion for summary judgment is, to be sure, because there remains a genuine factual dispute that calls for a trial and for fact finding by judge or jury. *Roland v. Lloyd E. Mitchell, Inc.,* 221 Md. 11, 19–20, 155 A.2d 691 (1959) ("An inference might be drawn either way.... [A] summary judgment, therefore, could not properly be entered. Accordingly, the summary judgment in favor of Mitchell must be reversed."); *Keesling v. State,* 288 Md. 579, 592, 420 A.2d 261 (1980) ("Under the facts

here, a jury might find Keesling an unwilling participant, but a participant nevertheless. It was, therefore, error for the trial court to grant summary judgment."); *Fireman's Fund Ins. Co. v. Rairigh*, 59 Md.App. 305, 313, 475 A.2d 509 (1984) ("Summary judgment cannot be granted if there is a genuine dispute as to any material fact ... We believe that the issue of whether the Earlbeck estate sought a defense from Fireman's Fund, considered in the context of the inferences most favorable to Fireman's Fund, presented a genuine dispute as to a material fact that precluded the entry of summary judgment."); *Lombardi v. Montgomery County*, 108 Md.App. 695, 710–11, 673 A.2d 762 (1996) ("Drawing all inferences in his favor, we hold that reasonable minds could have differed as to when appellant had the requisite knowledge. Disposing of the issue by way of summary judgment was, therefore, completely inappropriate.")

Had that been the situation in this case, there would be much merit to Commercial Union's argument. That is not, however, the situation in this case. With respect to the validity of its three asserted defenses, Commercial Union does not even suggest a scintilla of a genuine factual dispute. It does nothing but reiterate its flawed syllogism that the Court of Appeals held there to have been non-finality on those issues and that, *ergo*, the Court of Appeals necessarily mandated that there be further fact finding by the trial court. There is an almost petulant insistence to Commercial Union's argument: "The Court of Appeals decreed that there be further fact finding; therefore, there must be further fact finding even if nobody knows what further facts there are to find."

The Court of Appeals, however, was silent as to what sort of further resolution was called for. Commercial Union reads into that silence something that was never said and, in our judgment, was never implied.

**B. Denial of Summary Judgment # 2: Discretionary Option Even Absent Genuine Dispute of Fact**

There is a second possible reason for a denial of a motion for summary judgment and it is one that would not

necessarily call for further fact finding. Further fact finding might be conducted in the discretion of the trial judge but it would not be mandated as a matter of law. As Judge Digges pointed out in *Metropolitan Mortgage Fund v. Basiliko*, 288 Md. 25, 415 A.2d 582 (1980), a trial judge has the discretion 1) to deny or 2) simply to defer the granting of summary judgment even when there is no genuine dispute of a material fact and even when all of the technical requirements for the entry of such a judgment have been met. In *Porter Hayden v. Commercial Union*, Judge Eldridge discussed this discretionary power in a trial judge to deny a summary judgment motion:

> *Even where there is no dispute as to the material facts, and the "technical requirements for the entry of [summary] judgment have been met," a Maryland trial court has the discretion to deny a litigant's motion for summary judgment. Metropolitan Mtg. Fd. v. Basiliko, 288 Md. 25, 415 A.2d 582, 584 (1980).* As Judge J. Dudley Digges explained for the Court in *Metropolitan Mtg. Fd. v. Basiliko, supra,* 288 Md. at 29, 415 A.2d at 584, "denial (as distinguished from a grant) of a summary judgment motion ... involves not only pure legal questions but also an exercise of discretion as to whether the decision should be postponed until it can be supported by a complete factual record...." *See also Three Garden v. USF & G, supra,* 318 Md. at 108, 567 A.2d at 90 (even where the denial of one party's motion for summary judgment is contended to be tantamount to a grant of summary judgment in favor of the opposing party, "the trial court's discretion to deny or defer ruling ordinarily prevents an appellate court from directing that summary judgment be granted").

(Emphasis supplied).

In the *Basiliko* case, Judge Digges pointed out that the Maryland Rule (then Md. Rule 610) was based on its federal counterpart, Federal Rule of Civil Procedure 56. After analyzing the federal cases interpreting that Rule, Judge Digges concluded that that interpretation similarly applied to the Maryland Rule:

The federal authorities to which we allude make plain that whereas a "court cannot draw upon any discretionary power to grant summary judgment," it, ordinarily, does possess discretion to refuse to pass upon, as well as discretion affirmatively to deny, a summary judgment request in favor of a full hearing on the merits; and *this discretion exists even though the technical requirements for the entry of such a judgment have been met.*

288 Md. at 27–28, 415 A.2d 582 (emphasis supplied). The *Basiliko* opinion also made clear that the only basis for reversing the discretionary denial of summary judgment would be one in which there has been an abuse of discretion:

[W]e now hold that a denial (as distinguished from a grant) of a summary judgment motion, *as well as foregoing the ruling on such a motion either temporarily until later in the proceedings* or for resolution by trial of the general issue, involves not only pure legal questions but also an exercise of discretion as to whether the decision should be postponed until it can be supported by a complete factual record; and we further hold that on appeal, *absent clear abuse* (not present in this case), *the manner in which this discretion is exercised will not be disturbed.*

288 Md. at 29, 415 A.2d 582 (emphasis supplied). *See also Henley v. Prince George's County*, 305 Md. 320, 333, 503 A.2d 1333 (1986) ("[A] trial judge possesses broad discretion to deny a summary judgment even though the technical requirements for entry of such a judgment have been made."); *Geisz v. Greater Baltimore Medical Center*, 313 Md. 301, 314 n. 5, 545 A.2d 658 (1988).

In *Three Garden Village v. U.S. F. & G.*, 318 Md. 98, 108, 567 A.2d 85 (1989), the Court of Appeals, speaking through Judge Rodowsky, pointed out that even "if the record ... would have supported summary judgment," an appellate court may not direct that summary judgment be granted because that would interfere with the trial judge's broad discretion to deny it:

Even if the record before the circuit court at the time of USF & G's motion would have supported summary judgment for USF & G, the trial court's discretion to deny or defer ruling ordinarily prevents an appellate court from directing that summary judgment be granted. Without abusing its discretion, a trial court may decide, for example, that a party should be allowed a further opportunity to develop facts or to explore an alternate theory of claim or defense.

■ In this discretionary scenario, where the circumstances would permit the grant of summary judgment but where the judge chooses to deny the grant entirely or simply to defer it, two denouements are possible. The judge, in his discretion, might choose to submit the material factual issues to a jury (or engage in such fact finding himself) notwithstanding the literal absence of a genuine dispute. The judge might, on the other hand, choose to grant the summary judgment at some later time in lieu of any further fact finding. The only inhibition would be that he not abuse his discretion.

■ We analyze at the length we do this second and discretionary reason why a motion for summary judgment might sometimes be legitimately denied in order to emphasize a point. It is one which Commercial Union seems reluctant to accept. It is that although a denial of a summary judgment motion may leave an issue, at least temporarily, unresolved, it does not necessarily mean that there is a genuine dispute of material fact requiring an evidentiary hearing before a fact finder. There are other modalities for resolving open issues.

■ In concluding our examination of this possible reason for denying a summary judgment motion, we should note that *Presbyterian University Hospital v. Wilson,* 99 Md.App. 305, 637 A.2d 486 (1994), suggests a limitation on the broad discretion of a trial judge to deny summary judgment to a party who has seemed to qualify for such judgment in his favor. Judge Alpert's analysis for this Court was that all of the cases (*Basiliko* and its progeny) granting discretion to a trial judge to deny summary judgment even when the moving party has

shown entitlement to it are limited to situations in which the summary judgment issue involved the presence or absence of a genuine dispute of a material fact. *Presbyterian Hospital* went on to hold that where the resolution of the summary judgment issue involves, by contrast, only an interpretation of law, it is then reversible error for a court not to grant summary judgment in favor of a party who has moved for it and is entitled to it as a matter of law. Where only legal rulings are involved, the trial judge would lack the discretion to deny summary judgment to which the moving party was legally entitled.

The limitation suggested by *Presbyterian Hospital,* however, has no bearing on the case now before us. We are dealing with a situation in which Commercial Union was not entitled to summary judgment by legal rulings that should have been made in its favor and was only denied such favorable rulings by virtue of the trial judge's discretion. Even if that were the case (it is not), moreover, that would still not be a situation calling for further fact finding and for deferring finality of judgment until such fact finding took place.

### C. Denial of Summary Judgment # 3: Where Judgment in the Opposite Direction Would Be Justified But Is Neither Requested Nor Spontaneously Granted

There is a third reason why a party's motion for summary judgment might legitimately be denied and it is one that self-evidently would not call for any further fact finding. That would be the situation where the reason why Commercial Union, for instance, would be denied summary judgment in its favor would be because summary judgment could actually be granted in the opposite direction, to wit, in Porter Hayden's favor. In such a case, the denial of summary judgment in favor of Commercial Union self-evidently would not require that any further fact finding be conducted. It would be the case, rather, in which the necessary predicate existed for the granting of summary judgment in the opposite direction and in which all that remained to be done would be the formalities of 1) requesting and 2) granting such judgment in favor of the

opposing party. Though they may be nothing but formalities, however, those formalities must still be observed.

That was precisely the situation in this case as of March 12, 1992. In three separate motions requesting summary judgments in its favor, Commercial Union had urged that each of three possible defenses absolutely foreclosed any claims of coverage by Porter Hayden from being effectively asserted. Judge Caplan denied all three motions by three separate written orders supported, respectively, by three separate written opinions. *In each case, he first determined that there were no disputed facts to be resolved.* In each case, he ruled that the defense asserted by Commercial Union was invalid as a matter of law.

The dispositive fact in terms of the non-finality of the judgment, however, is that although a sufficiently sweeping predicate apparently existed to justify summary judgment in favor of Porter Hayden, Porter Hayden never requested such summary judgment with respect to the nine missing policies and Judge Caplan did not *sua sponte* grant summary judgment with respect to those missing policies.

As of the first appeal, therefore, the question of the viability of those defenses to the missing policies had never been formally resolved. There were strong implications, to be sure, but no formal resolution. The Court of Appeals pointed out that not only were there factual issues yet to be decided in terms of the existence and the content of the nine missing policies but that "numerous issues appear to be open with respect to the missing policies," if they should be proved to exist. The viability of the three defenses asserted by the summary judgment motions were foremost among those unresolved issues. The denial of Commercial Union's summary judgment motions with respect to those issues had not finally resolved the questions of their viability with respect to the missing policies because the mere denials, in and of themselves, left the matters open. Thus, although there were no genuine disputes of material fact calling for further fact

finding, there were nonetheless unresolved issues calling for final resolution.

It is in this regard that the position taken by Porter Hayden in its brief sweeps too broadly. It is its position that just because there were no remaining factual disputes and just because Judge Caplan had made all the legal rulings necessary to support a final judgment, there logically must have been a final judgment. That is not the case. There are necessary protocols for transforming the implicit into the explicit. As of the proceedings before Judge Caplan in 1992, those protocols had not yet been observed.

 Even where the reasons for denying summary judgment in one direction are tantamount to a full justification for granting summary judgment in the opposite direction, *the decisional process is not self-executing.* Absent a motion for summary judgment by a party, however eminently entitled that party may be to it, and absent, at the very least, a *sua sponte* granting of such a motion by the trial judge, that which *could* have been done and even that which *should* have been done *will still not have been done.* It is necessary that the final "i" be formally dotted and that the final "t" be formally crossed. It is sometimes necessary that the party to be benefitted request the summary judgment; it is always necessary that such judgment be formally granted.

 Even when the logic dictating a grant of unsolicited summary judgment in favor of an opposing party is compelling, there are procedural inhibitions on a trial judge's prerogative to act *sua sponte* upon such logic. It has long been established that a trial judge may not grant summary judgment *sua sponte* in the total absence of a motion for summary judgment by the parties, even when the factual and legal situation seems to cry out for it. *Griffin v. Anne Arundel County,* 25 Md.App. 115, 333 A.2d 612 (1975); *Harris v. Stefanowicz Corp.,* 26 Md.App. 213, 218, 337 A.2d 455 (1975). Indeed, until Maryland Rule 610 was replaced, on July 1, 1984, by Maryland Rule 2–501, a judge was limited either to denying a judgment or to granting a judgment *in favor of the moving*

*party.* No matter how logically compelling the situation, a judge could not, absent a cross motion, *sua sponte* grant a judgment in favor of the opposing party. The ability to grant summary judgment was one-directional. As Judge (now Chief Judge) Bell pointed out for the Court of Appeals in *Hartford Ins. Co. v. Manor Inn,* 335 Md. 135, 642 A.2d 219 (1994), however, that limitation no longer abides under the new Rule. Although a judge still may *not,* absent a motion, grant a judgment *sua sponte* in favor of a third party, he may grant a judgment not only *for the moving party* but also *against the moving party* (to wit, in favor of the opposing party). A cross ruling is no longer dependent on a cross motion. The prerogative to grant a summary judgment is now at least two-directional, even if not multi-directional.

Thus, in the present case, a motion for summary judgment by Commercial Union would have been enough to support a judgment in favor of Porter Hayden, even absent a motion by Porter Hayden. Even though the formalities have been thus relaxed in terms of the necessity for the ultimately benefitted party formally to move for such a judgment, however, there is still the requirement that the judge formally grant the judgment. He is not compelled to do so, absent a motion, and the grant is not self-executing.

Indeed, as the hearings concluded before Judge Caplan in the Spring of 1992, sweeping summary judgment in favor of Porter Hayden to the effect that Commercial Union's defenses were not viable with respect to any of the eleven policies would have required some stretching. With respect to the "premises operations" versus "hazardous products" coverage issue, it would have been speculative to have made a determination in that regard until Porter Hayden had first established the existence and the contents of the nine missing policies.

After the jury, on remand, rendered its verdict with respect to those missing policies in January of 1996, however, the predicate for plenary judgment in favor of Porter Hayden was fully established. The syllogism was obvious. Its major premise had been established in 1992:

Commercial Union's defenses are not viable with respect to the two extant policies.

Its minor premise was then established by the jury's verdict in 1996:

The coverage of the nine missing policies is substantially the same as the coverage of the two extant policies.

There but remained to say "Ergo" and to pronounce the ineluctably valid conclusion that Commercial Union's defenses are not viable with respect to the nine missing policies as well. That conclusion, however, notwithstanding its ineluctability, could not speak for itself. It required a formal enunciation by the court.

It is in this regard that Commercial Union has put on "blinders" in making its argument as to non-finality. When Judge Angeletti held a scheduling conference with counsel prior to the trial on remand, he did, to be sure, announce that there would be no further hearings with respect to the three defenses because Judge Caplan had already made legal rulings with respect to them. Judge Angeletti announced that he was not going to relitigate those matters which Judge Caplan had decided as a matter of law. From that, Commercial Union concludes that Judge Caplan's failure to have resolved finally those once open issues was thereby perpetuated into a similar failure on the part of Judge Angeletti.

■ Judge Angeletti did more, however, than simply adopt those rulings as his own. He then acted on them. We agree with Commercial Union that Judge Caplan's earlier rulings were inartfully characterized by Judge Angeletti as "the law of the case." "[T]he law of the case doctrine does not apply to trial court decisions in Maryland unless a statute or rule renders the decision binding or when no appeal is taken from the final judgment." *Ralkey v. Minnesota Mining and Mfg. Co.*, 63 Md.App. 515, 522, 492 A.2d 1358 (1985). *See also National Liberty Insurance Company v. Thrall*, 181 Md. 19, 22–23, 27 A.2d 353 (1942); *Placido v. Citizens Bank & Trust Co.*, 38 Md.App. 33, 44–46, 379 A.2d 773 (1977).

The use of the phrase "law of the case," however, was casual and not pivotal. Judge Angeletti clearly was not reluctantly following prior rulings with which he disagreed but by which he felt bound. He freely chose to adopt Judge Caplan's rulings as his own, as he was entitled to do. *"While the trial judges may choose to respect a prior ruling in a case,* they are not required to do so." *Ralkey v. Minnesota Mining,* 63 Md.App. at 522–23, 492 A.2d 1358 (emphasis supplied). *See also Placido,* 38 Md.App. at 45, 379 A.2d 773; *Thrall,* 181 Md. at 22–23, 27 A.2d 353; *Driver v. Parke–Davis Co.,* 29 Md.App. 354, 362, 348 A.2d 38 (1975); *Walker v. State,* 12 Md.App. 684, 689, 280 A.2d 260 (1971).

Then, on the basis of those adopted legal rulings in combination with the jury's verdict as to the missing policies, Judge Angeletti took the further step of granting a full and final judgment in favor of Porter Hayden with respect to all outstanding issues. He thereby formally pronounced the conclusion to the theretofore dangling syllogism. By granting judgment in favor of Porter Hayden with respect to all policies, he formally dotted the final "i" and formally crossed the final "t." Rightly or wrongly, a subject to which we now turn our attention, all issues were finally decided. As a threshold determination, we at least have before us an appealable final judgment.

### Allegedly Erroneous Rulings Affecting the Trial on Remand

Following the remand from the Court of Appeals, Judge Angeletti conducted a jury trial on the limited issues of 1) the existence and 2) the substance of the missing policies. The jury's verdict was that those policies did, indeed, exist and that their coverage was in all essential regards the same as was the coverage of the extant policies. Commercial Union contends that that trial on remand was flawed by two erroneous rulings, one at trial and one pre-trial.

### A. The Preclusion of an Additional Expert Witness

Commercial Union first complains that Judge Angeletti erred in refusing to permit the late designation by

Commercial Union of an expert witness, thereby precluding the testimony of that witness.

There had been a mini-trial before Judge Caplan in 1992 on the issue of the missing policies. There had been, pursuant to Maryland Rule 2–402(e)(1), full compliance with subsection (A), which provides:

A party by interrogatories may require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, to state the substance of the findings and the opinions to which the expert is expected to testify and a summary of the grounds for each opinion, and to produce any written report made by the expert concerning those findings and opinions[.]

Commercial Union had identified an expert witness in a timely manner. At the mini-trial before Judge Caplan, however, it elected not to call him. Even after the time for complying with discovery had passed, however, Commercial Union could have sought the permission of the court to designate an additional or an alternative expert witness.

It was on July 17, 1995 that the Court of Appeals remanded this case for a trial on the issue of the missing policies. It was still a period within which the permission of the trial court might have been sought to designate a new expert witness. The trial on remand was initially set for December 4, 1995. It was not until November 17, 1995, however, that Commercial Union sent a letter to counsel for Porter Hayden informing it that Commercial Union intended to call Dr. Peter R. Kensicki as an expert witness in the upcoming trial. Specifically, the letter informed Porter Hayden that "Dr. Kensicki will provide expert testimony in the same areas that Porter Hayden has elicited expert testimony from Mr. Malecki—*i.e.*, issues relating to the proof, terms, and conditions of the 'missing' policies." Commercial Union then suggested a late November date on which Porter Hayden might wish to depose Dr. Kensicki.

Three days later, on November 20, Porter Hayden replied:

As we previously advised, Porter Hayden strongly objects to CU's belated attempt to designate another expert witness. All of the missing policies issues were thoroughly discovered during the prior proceedings in the Circuit Court. CU was aware that Porter Hayden had designated an expert concerning missing policies issues; in fact, CU previously designated an insurance expert, *but then for its own reasons elected to withdraw its designated expert.* Now CU attempts to name a *new expert witness,* not previously named or deposed in this case.

The present attempt by CU to name a new expert witness is grossly out of time and obviously prejudicial to Porter Hayden.

(Emphasis in original). A copy of the November 20 letter was delivered to Judge Angeletti.

In the ensuing "battle of correspondence" over the "late" designation of Dr. Kensicki's expert testimony, Commercial Union faxed a follow-up letter to Judge Angeletti, also on November 20. In that letter, Commercial Union maintained that "the only issue truly presented by the instant disagreement is whether a party that did not call an expert in the first round of trial court proceedings can later identify and use expert testimony in the event of a remand from the appellate court for a new trial." According to Commercial Union, it was justified in designating such an expert witness.

Judge Angeletti, however, was not persuaded. On that same day he issued the following Order:

Treating the November 17, 1995 letter from defendant's attorney as a Motion to Extend Discovery, and the November 20, 1995 letter from plaintiff's attorney as opposition thereto, it is this 20th day of November, 1995, by the Circuit Court for Baltimore City, Part 21;

**ORDERED,** that defendant's Motion to Extend Discovery be and the same is hereby denied.

/s/ Edward J. Angeletti
Judge

Commercial Union was thereby precluded from calling Dr. Kensicki as an expert witness at trial. It now complains that that preclusion was reversible error because "the evidence was misleadingly one-sided, and the trial as a whole was rendered fundamentally unfair."

This is quintessentially the type of "call" which is entrusted to the wide discretion of the trial judge and which appellate courts are loath to second-guess. "The admission or exclusion of evidence is a function of the trial court which, on appeal, is traditionally viewed with great latitude" and "[a]n appellate court will only reverse upon finding that the trial judge's determination was both manifestly wrong and substantially injurious." *Swann v. Prudential Ins. Co.,* 95 Md.App. 365, 374–75, 620 A.2d 989 (1993). *See also Starfish Condo. v. Yorkridge Service,* 295 Md. 693, 712, 458 A.2d 805 (1983); *Klein v. Weiss,* 284 Md. 36, 55–56, 395 A.2d 126 (1978); *Snyder v. Snyder,* 79 Md.App. 448, 460–61, 558 A.2d 412 (1989); *Cotter v. Cotter,* 58 Md.App. 529, 544–45, 473 A.2d 970 (1984); *Hadid v. Alexander,* 55 Md.App. 344, 350–52, 462 A.2d 1216 (1983).

Commercial Union cites numerous cases in which trial judges were held not to have abused their discretion when they permitted experts to testify notwithstanding late designations. What those cases illustrate, however, is the wide discretion vested in trial judges in ruling on such matters. They do not by any means suggest that the trial judges would have been guilty of clear abuses of discretion had they ruled otherwise.

At the time of Judge Angeletti's ruling, the trial was still scheduled for the week of December 4, 1995. Porter Hayden would only have been given approximately two weeks' notice to depose the intended expert and to prepare a possible defense to his testimony. The issue of missing policies had been thoroughly discovered by both parties during the prior proceedings before Judge Caplan. Given the substantial and lengthy history of the instant case, we see no clear abuse of discretion in the decision of Judge Angeletti in refusing to

allow the testimony of Dr. Kensicki and to flirt with further delay.

### B. The Admission of Former Testimony Under Maryland Rule 5–804(b)(1)

On the first day of trial, January 3, 1996, Commercial Union objected to the intended use by Porter Hayden of the former testimony in lieu of the live testimonial appearance of an expert witness, Donald Malecki. Involved was the Rule Against Hearsay and one of its firmly rooted exceptions: Former Testimony.

Maryland Rule 5–804(b), entitled "Hearsay Exceptions; Declarant Unavailable" provides:

> **(b) Hearsay Exceptions .**—The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> (1) *Former Testimony.*—Testimony given as a witness in any action or proceeding or in a deposition taken in compliance with law in the course of any action or proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

Subsection (a) of that rule lists the circumstances under which a witness is properly deemed unavailable for the purposes of 5–804(b). "Unavailability" is defined, inter alia, as a circumstance in which the hearsay declarant is "unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity[.]" 5–804(a)(4).

 Commercial Union's sole challenge to the admission of Mr. Malecki's former testimony was on the ground that Porter Hayden failed adequately to show that the witness was unavailable. Porter Hayden had, however, proffered a lengthy and very specific explanation as to why the witness was "unavailable." That explanation included the fact that the witness, a resident of Kentucky, had been suffering from medical problems for some time prior to the upcoming trial,

and the witness had tried to give a deposition in an unrelated case but had been unable to complete the deposition due to his health problems.[7] The trial court, on considering the reasons detailed by Porter Hayden's counsel, accepted the fact that Mr. Malecki was unavailable and allowed his prior testimony to be admitted at trial.

Commercial Union mainly argues that Judge Angeletti acted improperly in relying on counsel's proffer as a basis for his decision. It, however, cites to no authority in Maryland supporting its position that a trial court cannot rely on counsel's in-court and on-the-record explanation as a basis for a finding of unavailability. We know of none. As officers of the court, lawyers occupy a position of trust and our legal system relies in significant measure on that trust. We agree completely with Judge Angeletti's handling of the situation:

> I rely on counsel and if counsel makes a representation, as far as I am concerned, counsel's word is counsel's bond unless there is something to the contrary that the opponent can bring in.

Commercial Union also relies heavily on this Court's decision in *Myers v. Estate of Alessi*, 80 Md.App. 124, 136–40, 560 A.2d 59 (1989), for the proposition that a heightened scrutiny of the unavailability of expert witnesses should be applied before the Former Testimony exception to the Hearsay Rule may successfully be evoked. *Myers*, however, dealt with a situation in which the expert witness was found to be unavailable *solely* on the basis of his residence in another state and was "beyond the subpoena power of the state." The facts in *Myers* are clearly distinguishable from the ones in this case involving Mr. Malecki's obvious health problems in addition to his residence outside of the state. Evidentiary rulings such as this one are entrusted to the wide discretion of the trial judge and appellate courts will not reverse absent a clear abuse of

---

7. Counsel for Porter Hayden explained to the court that Mr. Malecki's health problems included a "perforated esophagus which is a condition involving an ulcer of his esophagus" as well as "a relating condition involving a spastic colon."

that discretion. We see no clear abuse of discretion in this case.

 Even were this evidentiary ruling considered to be erroneous, however, we are persuaded that the error would have been harmless. Any prejudice would have been minimal. Commercial Union complains that without the benefit of Mr. Malecki's live testimony, it was unable to impeach Mr. Malecki with "potentially devastating impeachment material." Specifically, Commercial Union refers to the expert testimony given by Mr. Malecki in an unrelated trial that took place in New York during the course of which Mr. Malecki testified that "it is always necessary to have an executed copy of a policy in order to demonstrate coverage under that policy." Commercial Union argues that "this testimony would have been the essence of impeachment material, given Mr. Malecki's testimony in the instant case that in determining the nature of coverage provide[d] by Commercial Union's missing policies, 'you don't even need a policy.' "

Commercial Union, however, had the benefit of that impeachment. Judge Angeletti, over Porter Hayden's objection, allowed the testimony of Mr. Malecki from the New York trial to be read into the record in the case at bar. The allegedly inconsistent position of Mr. Malecki was before the jury for impeachment purposes and Commercial Union was fully entitled to use it in jury argument.

Even assuming error, which we hold not to have been the case, do we think that documentary impeachment is as effective to the nth degree as impeachment face to face? No. Do we think that the verdict would have turned on so modest a difference? No.

### The Statute of Limitations

Commercial Union contends 1) that initially Judge Caplan erroneously denied its Motion for Summary Judgment based on the Statute of Limitations and 2) that subsequently Judge Angeletti erroneously adopted the rationale of Judge Caplan rejecting that defense and thereby committed error in grant-

ing Porter Hayden's Motion for Summary Judgment. The controlling legal provision is Md.Code Ann., Cts. & Jud. Proc. § 5–101, which provides:

A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced.

Measuring three years is easy. Ascertaining the date on which the three-year measurement is to begin is far from easy. The problem is that of identifying "the date" when the "civil action" actually "accrues." In its Motion for Summary Judgment based on the Statute of Limitations, Commercial Union argued that throughout the years 1978, 1979, and 1980, it regularly received requests from Porter Hayden for coverage of asbestos-related claims and regularly advised Porter Hayden that it would not participate in defending such claims without a showing that Porter Hayden enjoyed "products hazard" coverage. Commercial Union claims that its first refusal to defend absent a showing of "products hazard" coverage marks the accrual of the cause of action. It argued that the accrual occurred, at the very latest, in 1980. If its theory as to the accrual date were correct, however, there is no reason that the accrual should not have been as early as September 18, 1978, when Commercial Union, by letter, informed Porter Hayden that it would not participate in the defense of any asbestos-related claims absent proof of "products hazard" coverage.

On February 14, 1992, Judge Caplan issued his Decision and Order denying Commercial Union's request for summary judgment on the limitations issue. In his accompanying opinion, he gave as his rationale the fact that Porter Hayden had, within the limitations period, advanced a new theory of coverage, to wit, one based on premise operations, and that the denial of coverage under the new theory established a new accrual date:

There is little doubt that had PHC submitted the underlying claims on the basis that they should be defended and

indemnified as "product hazard" claims, the Court would have found those claims barred by the statute of limitations. However, the basis of the request for coverage here is not "products hazard," but for third party liability coverage for "operations." PHC submitted *new* causes of action, and submitted them based on a *new* theory concerning the basis upon which defense and indemnity is due. This claim was first rejected by PHC's September 21, 1987 receipt of CU's September 18, 1987 letter denying coverage.

It is for this reason, and this reason only, that the Court finds that PHC is not barred by the three year statute of limitations in this action.

That rationale given by Judge Caplan, incidentally, was not the defense to limitations urged by Porter Hayden.

By motion on February 20, Commercial Union asked for a reconsideration of that Order. A hearing was held on the motion on February 28. Commercial Union introduced uncontradicted evidence showing that Porter Hayden had advanced, and that Commercial Union had rejected, the "premises operations" coverage theory long before the controlling date of August of 1987. It was clear that Porter Hayden was advancing no "new coverage theory" in 1987. Accordingly, Judge Caplan amended his ruling that Porter Hayden's action was not barred by limitations and advanced an alternative rationale in support of that ruling. We have no need, therefore, to address further the original rationale based on Porter Hayden's having offered in 1987 a new theory of coverage.

On March 12, 1992, Judge Caplan granted Commercial Union's Motion for Reconsideration in part and modified his Decision and Order with respect to the limitations issue:

This Court's Decision and Order entered on February 14, 1992 regarding the statute of limitations issue should be and the same is hereby MODIFIED to reflect that Porter Hayden's rights to seek coverage for all underlying asbestos-related claims of which it had notice prior to September 21, 1987 are time-barred with the sole exception of the five

underlying claims tendered by Porter Hayden to Commercial Union for coverage by letter dated August 31, 1987.

That Modified Order of March 12, in combination with the unmodified portion of the February 14 Order, both of which were ultimately adopted by Judge Angeletti, did not, by everyone's agreement, apply to any claims that had been filed by third persons against Porter Hayden prior to January 1, 1987. Limitations, moreover, did not bar the declaratory judgment action with respect to the five claims serving as the basic predicate for the present case. Neither did limitations bar coverage with respect to any claims filed against Porter Hayden after September 21, 1987. What the March 12 modification of the February 14 Order did was to declare that Porter Hayden was barred by limitations from seeking coverage for any underlying asbestos-related claims, other than the five in this case, filed against it between January 1, 1987 and September 21, 1987.

We confess that trying to get a firm handle on the rationale behind the modification is a bit like trying to solve the riddle of the Sphinx. Following extensive argument at a hearing on the Motion for Reconsideration on February 28, 1990, the trial court reasoned as follows:

The evidence shows in some of the memos and motions that while the theory of coverage was raised early, it was during the time that the interim agreement was in effect between the parties, if that took place, between the '83 and the '86 time frame, and that interim agreement tolled the cause of action, and the Court was satisfied that the Plaintiffs properly and timely challenged the first denial of the coverage based on that theory after the interim agreement expired. Commercial Union argues that a new theory on the same facts is not enough to constitute a new cause of action, but here the Court believes there are underlying claims and facts and not simply the formulation of a new theory on a set of facts already presented to the Court.

In their briefs before this Court, both Commercial Union and Porter Hayden characterize the modification of the original

ruling as one based on the trial court's conclusion that the Hartford Agreement had somehow "tolled" the Statute of Limitations, notwithstanding the fact that neither party had urged any theory based on such "tolling."

It would seem that the trial court was attempting to salvage as much of its original February 14 rationale as possible. The court's original reasoning on February 14 had been that a new cause of action accrued and the Statute of Limitations began to run anew when Commercial Union first rejected a claim submitted by Porter Hayden on the basis of a "premises operations" theory of coverage. On February 14, the trial court had opined, "As far as the Court can tell from the record, this is the first time that such a claim [one implicating 'operations' coverage] has been made by Porter Hayden to Commercial Union as the basis for defense and indemnification of asbestos-related claims." At the hearing on the Motion for Reconsideration, however, Commercial Union offered evidence that Porter Hayden had asserted and Commercial Union had denied coverage on the basis of an "operations" theory at least as early as 1983. A question then posed by the trial judge gave an indication of the court's thinking:

Wasn't there an agreement, however, that there would be no suits filed during the period, the interim period, so that even if that may have been a theory, using your argument, that they were prohibited from filing suit until after the expiration of that agreement?

It would seem that the court may have been saying that a denial of coverage on the basis of an "operations" theory might have occurred as early as 1983 but that the Statute of Limitations could not begin running as of that time because, pursuant to the Hartford Agreement, no suit could be filed at that time. Only with the unlocking of the opportunity to file suit on January 1, 1987, could limitations begin to run. Such an explanation, however, seems incongruous with a ruling that the five underlying claims in this action were not also thereby barred. We agree with the trial court that the Statute of Limitations was no bar to the declaratory judgment sought by Porter Hayden in this case, but we do so for reasons totally

different than those advanced by the trial court on either February 14 or March 12, 1992.

 In any event, we will not seek further to unravel the Gordian Knot but will cut it. The sword we wield to that end is the incisive analysis of Chief Judge Wilner for this Court in *Luppino v. Vigilant Ins.*, 110 Md.App. 372, 677 A.2d 617, *cert. granted,* 343 Md. 745, 684 A.2d 836 (1996). In *Luppino,* to be sure, we were dealing with a breach of contract suit itself and not a declaratory judgment. As we shall examine more fully *infra,* however, when the suit for the underlying breach of an insurance contract to defend and possibly to indemnify would not be time-barred, neither will an action seeking a declaratory judgment with respect to such coverage.

In *Luppino,* the insurer notified the insured on October 19, 1990, that, in its judgment, it had not provided coverage for the underlying action for which Luppino was being sued by a third party. The insurer advised Luppino that it would not, therefore, provide either indemnity or a defense to the lawsuit. Luppino first filed suit against the insurer on May 31, 1994, over threeand-a-half years after the insurer had notified him that it was not providing coverage. The insurer moved for summary judgment on the ground that the cause of action accrued at the time of that notification and that limitations, therefore, had run. The circuit court agreed and granted summary judgment on the ground that the suit was time-barred. On appeal to this Court, we reversed.

Judge Wilner's analysis began by stating the fundamental proposition that a breach of a contractual duty under an insurance policy is to be measured by the same standards that are applicable to breach of contract actions generally:

> The important point in *Lane* is that an action by an insured against his insurer for breach of a contractual duty imposed in the policy is governed by the principles applicable to breach of contract actions. The threshold issues are the nature of the duty and when it was breached.

The *Luppino* case in this regard cited the opinion of the Court of Appeals in *Lane v. Nationwide Mut. Ins. Co.,* 321

Md. 165, 169–70, 582 A.2d 501 (1990), wherein Judge Eldridge had stated:

> [W]e have held, in accordance with the great majority of jurisdictions in this country, that an action by an insured against his own insurance company for uninsured motorist benefits is clearly a contract action and therefore is governed by the principles and procedures applicable to contract actions generally.

(Internal quotations omitted).

With respect to breach of contract cases generally, Judge Digges stated the basic principle unequivocally in *Mayor and Council of Federalsburg v. Allied Contractors*, 275 Md. 151, 157, 338 A.2d 275 (1975):

> In contract cases, the general rule is that the period of limitations begins to run from the date of the breach, for it is then that the cause of action accrues and becomes enforceable.

*See also Reese v. State Farm Mut. Auto. Ins.*, 285 Md. 548, 552–53, 403 A.2d 1229 (1979).

In identifying the precise date on which an actual breach of the insurance contract occurred and the precise date on which the cause of action, therefore, accrued, *Luppino* pointed out that it is first necessary to distinguish "between an action for breach of the duty to defend and one for breach of duty to pay." 110 Md.App. at 376, 677 A.2d 617.

## A. Breach of Contractual Duty to Indemnify

Turning first to the question of "when Luppino's action for breach of the duty to pay accrued," this Court initially rejected the contention of the insurer that the cause of action "accrued on the day [the insurer] informed Luppino that there was no coverage." 110 Md.App. at 376, 677 A.2d 617. We went on to fix with precision the date on which the duty to pay arose and when the breach, therefore, occurred:

> We conclude that Luppino's obligation became legally fixed, and thus *the duty to pay arose, when the judgment was entered against him by the circuit court* in May, 1992.

That judgment, of course, was subject to being upset on appeal, but it was valid, final, and, unless stayed through the posting of acceptable security, was subject to execution at that point.

110 Md.App. at 377, 677 A.2d 617 (emphasis supplied). Commercial Union's potential duty to indemnify Porter Hayden concerned indemnification for awards that Porter Hayden would be obligated to pay to third persons. As *Luppino* observed with respect to such a duty, "[the insured's] declaration of no coverage did not establish, or even trigger, any ultimate net loss that Luppino would be obligated to pay." 110 Md.App. at 378, 677 A.2d 617.

With respect to the five underlying claims in this case that Porter Hayden forwarded to Commercial Union in August of 1987, if Porter Hayden were suing Commercial Union for the breach of its contractual duty to indemnify, that possible duty would not yet have been established, that cause of action would not yet have accrued, and limitations would not yet even have begun to run.

The fact that an insurer's repudiation of coverage at an earlier time might be enough to give rise to a declaratory judgment action does not trigger the Statute of Limitations with respect to the underlying breaches of contract:

Luppino may have been able to file a declaratory judgment action upon receipt of Vigilant's letter, to test whether the company had a duty to defend and pay. . . .

Even if a declaratory judgment, or other, action could have been filed earlier to test the validity of Vigilant's position, however, the failure to file one does not necessarily affect the running of limitations with respect to a breach of contract action for damages.

110 Md.App. at 379, 677 A.2d 617 (citations omitted).

In terms of the accrual of the cause of action, there is no necessary correlation on the time line between 1) the events which might give rise to an action for declaratory judgment and 2) the breach of contract that would be the accrual for a cause of action based upon that breach. Md.Code Ann., Cts.

& Jud. Proc., § 3–407, dealing with declaratory judgments, provides:

A contract may be construed before or after a breach of the contract.

Commenting on that provision, *Luppino* observed:

Indeed, a principal function of a declaratory judgment proceeding generally is to resolve disputes over statutes, contracts, and other legal documents and relationships *before* an actual breach and injury occurs. Obviously, an action for damages based on breach of contract cannot be filed until there has, in fact, been a breach.

110 Md.App. at 380, 677 A.2d 617 (emphasis in original).

*Lane v. Nationwide Mut. Ins. Co.,* 321 Md. 165, 582 A.2d 501 (1990), also stands for the proposition that the Statute of Limitations will not begin to run on a suit by the insured against the insurer for the breach of the contractual duty to indemnify until that breach literally occurs. The insured husband and wife were involved in an automobile accident that was the apparent fault of an uninsured motorist. The insureds notified their insurance company of the accident shortly after it happened. On December 14, 1982, the insureds brought suit against the uninsured motorist. As of that date, if not before, they were aware that the defendant was uninsured. Three days later, they notified their insurance company of the suit they had filed. The insurance company, however, made no effort to intervene.

On April 17, 1986, over three years later, the insureds sued their insurance company for uninsured motorist benefits. The insurance company filed a motion for summary judgment, asserting that the action was barred by the three-year Statute of Limitations. The trial court agreed and dismissed the suit. This Court affirmed the trial court. The Court of Appeals reversed.

The Court of Appeals characterized our decision as one that "in effect held that limitations in a contract action begin to run before there is a breach of contract." 321 Md. at 170, 582 A.2d 501. The opinion by Judge Eldridge pointed out that the

Statute of Limitations cannot begin running until there is an actual breach of the contract:

> As long as the insured does not demand compensation under his own insurance policy, the uninsured motorist carrier is not called upon to pay under the contract, and, therefore, there can be no breach of contract causing the statute of limitations to begin running.

321 Md. at 173, 582 A.2d 501 (footnote omitted).

This Court, in upholding the ruling of the trial court in *Lane* that the Statute of Limitations had run, had relied significantly on our own earlier decision of *Yingling v. Phillips*, 65 Md.App. 451, 501 A.2d 87 (1985). We had there held that once an insured was on notice that the insurer intended to repudiate coverage, the Statute of Limitations began to run. We had held that the limitations period was triggered by an anticipatory breach of the contract, in that case consisting of the actual knowledge on the part of the insured of the intention on the part of the insurers to disclaim coverage. The Court of Appeals in *Lane v. Nationwide* expressly overruled our decision in *Yingling:*

> As the Court of Special Appeals' position adopted in *Yingling v. Phillips, supra,* ... is inconsistent with the decisions of this Court, *the Yingling case is overruled* ....

321 Md. at 177, 582 A.2d 501 (emphasis supplied).

In explaining why an anticipatory breach does not trigger the Statute of Limitations, Judge Eldridge quoted with approval from 4 *Corbin on Contracts:*

> [T]he "anticipatory breach" theory suggested in the *Yingling* case, based on the uninsured motorist carrier's disclaimer of liability prior to a demand upon it by the insured, does not call for a different result. Under circumstances like those in *Yingling* and the present case, *an anticipatory repudiation by the insurer does not cause the statute of limitations to begin running against the insured.* As explained in 4 *Corbin on Contracts,* § 989 (1951):
>
> > "There is no necessity for making the statutory period of limitation begin to run against the plaintiff until the day

fixed by the contract for the rendition of performance, at least unless the plaintiff definitely elects to regard the anticipatory repudiation as a final breach. It is generally said that he need not so elect and that he may properly wait until the time that performance was due, before regarding the contract as broken.... *[T]he defendant ought not to be allowed to complain at the delay in bringing action against him.* For the purpose of determining when the period of limitation begins to run, the defendant's non-performance at the day specified may be regarded as a breach of duty as well as the anticipatory repudiation. *The plaintiff should not be penalized for leaving to the defendant an opportunity to retract his wrongful repudiation; and he would be so penalized if the statutory period of limitation is held to begin to run against him immediately.*"

321 Md. at 174–75, 582 A.2d 501 (emphases supplied).

## B. Breach of Contractual Duty to Defend

 In *Luppino v. Vigilant Insurance,* Judge Wilner turned separately to the question of when limitations begin to run for a breach of the contractual duty to defend. In the *Luppino* case, the contractual duty in that regard was initially breached early in the history of the litigation:

[T]he duty to defend ... of course, arose in November, 1989, when Luppino informed Vigilant of the lawsuit that had been filed against him, and it clearly was breached on October 19, 1990, when the company expressly declined to provide the defense.

110 Md.App. at 381, 677 A.2d 617.

 The duty to defend, however, is a continuing one and the breach may continue (or it may stop) at various points in the course of a protracted litigation. Even if the duty to defend were not complied with in an initial trial, there would still be a duty to defend on appeal or at a trial on remand. Judge Wilner discussed the continuing nature of the duty:

Unlike the duty to pay, . . . the duty to defend is necessarily a continuing one that commences upon notice of the claim and extends at least until a judgment is entered and all appeals from it have been resolved. *The duty thus arises at an earlier point than the duty to pay and may extend to a later time.* The amount of damage from a breach cannot realistically be determined until the entire case is over, because they continue to accrue, incrementally, throughout the course of the litigation.

110 Md.App. at 382, 677 A.2d 617 (emphasis supplied).

The reason why the Statute of Limitations should not begin to run with the initial breach of the duty is that it might foreclose several of the options available to the insured when faced with the initial breach:

Faced with a refusal of the insurer to defend a claim, the insured has three possible options, other than acquiescence: he can, to the extent permitted by [*Allstate Insurance Co. v.*] *Atwood* [319 Md. 247, 572 A.2d 154 *(1990)],* file a declaratory judgment action, presumably at any point along the way; he can bring one or more successive actions to recover his interim and incremental costs as the case proceeds, subject to the defense against multiple, vexatious actions; or, as here, he can wait until the end when all of his damages are ascertained and then sue for the entire breach. Of the three choices, the third, in most instances, will be the most practical and efficient. That the others may, in given circumstances, be possible should not, therefore, preclude it.

110 Md.App. at 382, 677 A.2d 617.

*Luppino* held that the Statute of Limitations for the breach of the duty to defend does not begin to run until both a judgment is had in the trial court, and if an appeal is taken, that judgment is affirmed on appeal:

Upon this analysis, we conclude that, although Luppino might have been able to file suit earlier, the statute of limitations did not begin to run on the action for breach of the duty to defend until the Court of Appeals affirmed the

judgment in the underlying case. It was then that the final breach became manifest and the ultimate injury measurable. 110 Md.App. at 383, 677 A.2d 617.

Under the authority of *Luppino* and *Lane,* we hold that there has yet been no breach of Commercial Union's duty to indemnify Porter Hayden and no breach of its duty to defend the claims made against Porter Hayden. Accordingly, no causes of action in either regard have accrued and the Statute of Limitations, for underlying breach of contract actions, has not yet begun to run.

## C. Multiple Breaches

 Even if our reliance on *Luppino* and *Lane* were misplaced, however, we would nonetheless hold that the declaratory judgment action in this case was not barred by the Statute of Limitations for an alternative and independent reason. Under the liability policies in this case, Commercial Union undertook, depending on circumstances that might be proved at the trial table, to defend and potentially to indemnify Porter Hayden for an unlimited number of third-party claims that might be filed against Porter Hayden. Where the duty to defend and potentially to indemnify might attach, the failure to perform that duty with respect to each separate claim would constitute a distinct breach.

*Singer Co. v. B.G.& E.,* 79 Md.App. 461, 558 A.2d 419 (1989), was a case in which we dealt with the relationship between the Statute of Limitations and multiple breaches of contract. The question as posed, 79 Md.App. at 473, 558 A.2d 419, would apply, in our judgment, to the continuing duty in this case as well:

BG & E had a continuing contractual obligation to provide Singer with electricity. We thus perceive that our resolution of the issue *sub judice* turns upon a determination of whether a contract action based upon various alleged breaches of a continuing contractual obligation accrues for all time upon the first breach of that obligation of which the aggrieved party is aware or should have been aware, or

*whether each successive breach of such an obligation begins the running of the statute of limitations anew.*

(Emphasis supplied).

Our conclusion in *Singer* would also apply to the case now before us:

> [W]e conclude that *where a contract provides for continuing performance over a period of time, each successive breach of that obligation begins the running of the statute of limitations anew,* with the result being that accrual occurs continuously and a plaintiff may assert claims for damages occurring within the statutory period of limitations.

79 Md.App. at 475, 558 A.2d 419 (emphasis supplied).

We are dealing with a declaratory judgment action with respect to five claims that were submitted to Commercial Union for handling on August 31, 1987, and as to which Commercial Union disclaimed coverage on September 21, 1987. Commercial Union claims that such an action is barred because Porter Hayden failed to seek declaratory judgment with respect to other claims dating back to the 1970's. The argument does not follow.

Even if Porter Hayden had failed to move timely for declaratory judgment with respect to breaches by Commercial Union to defend or potentially to indemnify as to claims submitted by Porter Hayden during the 1970's or early 1980's, we know of no law that would preclude Porter Hayden from seeking a declaratory judgment with respect to other claims submitted by it in the late 1980's.

### D. What Applicability, If Any, Does the Statute of Limitations Have to a Declaratory Judgment Action?

There is, moreover, an overarching question and it is one as to which we find no guidance in the Maryland case law. What, if any, applicability does the Maryland Statute of Limitations even have to a declaratory judgment action? The Statute of Limitations directs that a civil action be filed within three years of the date it accrues. The accrual of a breach of contract action takes place when the breach occurs. An action

for declaratory judgment, however, may be brought even before a breach occurs. The interface between the provisions is extremely "iffy."

The only meaningful academic analysis of this question we have found is a Comment entitled, *Developments in the Law: Declaratory Judgments,* 62 Harv.L.Rev. 787, 831–32 (1949):

> The better rule, toward which the cases seem to be moving, is that *the right to declaratory relief continues until the right to coercive relief, as between the parties, has itself been extinguished.* ... [R]egardless of the time when a right to declaratory relief accrues, *the statute should begin to run when a coercive cause of action arises, and the statutory period should expire on the coercive and the declaratory causes of action simultaneously.* This result would not contravene the statute's policy of preventing unfair surprise and presentation of stale claims. The possibility of declaratory relief cannot be said to subject the party to undue uncertainty so long as coercive relief is or will be available; the evidence of a right cannot be deemed stale so long as that right may yet be transgressed in such a way as to entitle either party to coercive relief. And indeed if the uncertainty is burdensome, the aggrieved party may himself seek a declaration and eliminate his doubt.

(Footnotes omitted; emphases supplied).

The case law throughout the country on this admittedly esoteric subject is extremely skimpy. One of the two meaningful analyses we have found is *Western Cas. & Sur. Co. v. Evans,* 130 Ariz. 333, 636 P.2d 111 (1981). The first observation of the Court of Appeals of Arizona, 636 P.2d at 113, is very true:

> We first note that the question of whether and when statutes of limitations are applicable to declaratory relief actions is a less than clear area of the law.

The Court of Appeals went on to hold that the fact that a sufficient controversy existed to permit a request for declaratory judgment does not itself trigger the Statute of Limitations:

[T]he fact that either party could have sought a declaration regarding coverage as of the filing of the reservation of right does not mean that the action accrued at that time for statute of limitations purposes. For an action to accrue for limitation purposes, some event in the nature of a breach of contract must have occurred.

636 P.2d at 114.

■■■ The most incisive analysis of the problem was undoubtedly that made by the Supreme Court of California in *Maguire v. Hibernia Savings & Loan Soc.*, 23 Cal.2d 719, 146 P.2d 673, 681 (1944):

> We are of the opinion that the period of limitations applicable to ordinary actions at law and suits in equity should be applied in like manner to actions for declaratory relief. Thus, if declaratory relief is sought with reference to an obligation which has been breached and the right to commence an action for "coercive" relief upon the cause of action arising therefrom is barred by the statute, the right to declaratory relief is likewise barred. On the other hand, if declaratory relief is sought "before there has been any breach of the obligation in respect to which said declaration is sought," or within the statutory period after the breach, the right to such relief is not barred by lapse of time. *There is no anomaly in the fact that a party may have a right to sue for declaratory relief without setting in motion the statute of limitations.* Quiet title actions, forerunners of declaratory actions, may be maintained when an adverse claim to property is asserted, but the period of limitations does not commence to run at that date.

(Emphasis supplied).

We hold that Porter Hayden's declaratory judgment action in this case was not barred by the Statute of Limitations. The analysis in which we have engaged in reaching this holding will also be dispositive of one of the contentions raised by Porter Hayden in its cross-appeal.

### *Timely Notice of Occurrence And Choice of Law*

Commercial Union contends 1) that initially Judge Caplan erroneously denied its Motion for Summary Judgment based on the alleged failure of Porter Hayden to give timely notice of occurrence and 2) that subsequently Judge Angeletti erroneously adopted the rationale of Judge Caplan rejecting that defense and thereby committed error in granting Porter Hayden's Motion for Summary Judgment. An examination of this contention actually requires us to look at three separate issues: 1) the timeliness of the giving by the insured to the insurer of notice of an occurrence; 2) the sanction or remedy to be applied where there has been a failure of timely notice; and 3) most significantly, the choice of the state law (New York or Maryland?) by which the first two issues shall be examined.

In determining this timeliness of notice issue, we are, until we come to the choice of law sub-issue, significantly guided by the earlier opinion of this Court in *Commercial Union v. Porter Hayden,* 97 Md.App. 442, 630 A.2d 261 (1993). To be sure, the decision of the Court of Appeals in *Porter Hayden v. Commercial Union,* 339 Md. 150, 661 A.2d 691 (1995), vacated the ultimate decision of this Court. It did not, however, reject the very thorough analysis of Judge Harrell, except to the extent that it intimated that the choice of law aspect of the opinion, albeit not wrong at the time, might have been rendered out of date by supervening case law. In all other regards, however, we find the opinion highly persuasive even if not precedentially binding. As an artifact of legal literature, the opinion still exists, even if reduced to the status of *dicta.* The discussion is not merely highly persuasive; we are actually persuaded.

As of November 1948, when endorsements substituted the word "occurrence" for the word "accident," the policies contained the following notice provisions:

> Notice of [Occurrence]. When an [occurrence] occurs written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable. Such notice shall contain particulars sufficient

to identify the insured and also reasonably obtainable information respecting the time, place and circumstances of the accident, the names and addresses of the injured and of available witnesses.

Notice of Claim or Suit. If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

Prior to November 1948, the word "accident" had appeared rather than the word "occurrence."

## A. The Accrual of the Obligation to Give Notice

■ We agree with Judge Harrell's statement that an insured's notice obligation accrues when the circumstances known to the insured at that time would have suggested to a reasonable person the possibility of a claim. 97 Md.App. at 461, 630 A.2d 261. We conclude, moreover, that the time of accrual of the notice obligation would be the same under New York law and Maryland law.

■ Commercial Union initially argued that Porter Hayden was under an obligation to give notice of impending asbestos-related claims as early as 1965. In our earlier opinion, we agreed that the uncontested evidence showed that Porter Hayden (1) received asbestos-related workers' compensation claims beginning in the early 1950's; (2) learned in 1964 of a warning label adopted by Johns–Manville, a major asbestos manufacturer, indicating that the inhalation of asbestos dust was hazardous to human health; and (3) learned in 1964 of the findings contained in a major medical study, later published in 1965, that linked exposure to asbestos to the high incidence of pulmonary diseases among asbestos insulation workers. *Id.*

Notwithstanding those facts, we held unequivocally that that gradual accumulation of knowledge of the asbestos hazard did not itself trigger an accrual of the notice obligation:

We reject, however, Commercial Union's argument that these circumstances, on their own, gave rise to Porter Hayden's obligation to provide notice no later than 1965.

While these events no doubt should have sounded an alarm to Porter Hayden that the growing body of knowledge about asbestos hazards warranted the company's serious attention to the matter, we do not believe that the circumstances at that time were such as to suggest to a reasonable person the possibility of a claim. Although there were several workers' compensation claims related to asbestos diseases over the years, there was no strong or unequivocal indication of the asbestos litigation that eventually flooded the nation's courts beginning in the mid–1970's. Indeed, Porter Hayden did not receive its first third-party liability claim for asbestos-related injuries until 1976.

97 Md.App. at 461–62, 630 A.2d 261. It was the actual filing of the first asbestos-related claim against Porter Hayden that triggered the obligation. We held that that obligation on Porter Hayden accrued in August 1976:

That claim and the ones that followed immediately thereafter, however, did trigger Porter Hayden's notice obligation. The record extract clearly reflects that beginning in August 1976, Porter Hayden was served with lawsuits alleging injuries from exposure to asbestos in the insulation that it installed. Thus, in view of Porter Hayden's increasing knowledge of the danger presented by prolonged exposure to asbestos, the filing of the 1976 lawsuits should have suggested to a reasonable person the possibility of additional asbestos-related claims for which it might seek coverage from Commercial Union. In fact, in letters dated 3 September 1976 and 15 September 1976, counsel for Porter Hayden advised Porter Hayden's then insurance broker to notify Porter Hayden's primary and excess carriers of the asbestos claims. These facts establish that under New York law [and Maryland law as well] *Porter Hayden's obligation to put Commercial Union on notice that an occurrence took place accrued in August 1976.*

97 Md.App. at 462, 630 A.2d 261 (emphasis supplied).

## B. The Actual Giving of Notice

Although Porter Hayden's obligation to give notice to Commercial Union accrued in August of 1976, Commercial Union

did not receive such notice until the end of July of 1978. It was on July 31, 1978 that another one of Porter Hayden's insurers, by letter, requested Commercial Union to acknowledge its obligation to participate in the defense of an asbestos claim that had just been filed. A week later, on August 8, 1978, Porter Hayden directly wrote to Commercial Union requesting it to defend against the recently filed lawsuit. In terms of the actual receipt of the notice, we held in that earlier opinion:

> It is clear, then, that Commercial Union's first notice of occurrence involving Porter Hayden came two years after Porter Hayden's obligation to provide notice accrued.

97 Md.App. at 463–64, 630 A.2d 261.

## C. Timeliness of Notice and Prejudice

At this point in the analysis, the distinct but somewhat related factors of 1) timeliness of notice and 2) prejudice from lack of timely notice tend to dissolve into a not clearly defined amalgam. Even under the rigorous New York law, timeliness of notice is an elusive concept as it is variously defined as "as soon as practicable," "within a reasonable time under all the circumstances," "not an iron-bound requirement that it be immediate or even prompt," and "within a reasonable time in the light of the facts and circumstances of the case at hand." 97 Md.App. at 462–63, 630 A.2d 261. It is a slippery concept.

In states such as New York, where a showing by the insurer of prejudice is not required, the focus is largely on the untimeliness of the notice. The notion of prejudice is still there, however, with untimely notice being deemed prejudicial *per se*. In states such as Maryland, where a showing by the insurer of prejudice is required, the timeliness of the notice fades into a more subsidiary consideration. It nonetheless has an inevitable influence, albeit sometimes a subconscious one, on the showing of prejudice. As a practical reality, when the untimeliness is only marginal, it is, by inverse proportion, more difficult to satisfy the prejudice requirement. When the untimeliness is gross and inexcusable, on the other hand, it is much easier to satisfy the prejudice requirement.

It is this somewhat amalgamated untimeliness/prejudice factor that will determine whether an insured, because of its breach of its obligation under the policy to give timely notice, will be foreclosed from asserting its right to coverage under the policy. As we turn our attention to the untimeliness/prejudice factor in this case, the choice of law between Maryland and New York will be absolutely outcome-determinative.

As we shall examine briefly, albeit gratuitously, if New York law were to be applied, Porter Hayden's failure to have given timely notice to Commercial Union would result in a total victory for Commercial Union. Applying New York law, that was the holding we reached in our earlier decision in this case. Under New York law, we think it was a correct decision and we would follow it.

As we shall also examine briefly, but more pertinently, if Maryland law is applied, Commercial Union's failure to establish any actual prejudice that it suffered from the arguable lack of timely notice would foreclose it from asserting this defense and will result in total victory for Porter Hayden on this issue. The outcome of this case will turn on the choice of law.

### D. Lack of Timely Notice Under New York Law

In our earlier opinion, Judge Harrell, after determining that New York law applied, surveyed at length, 97 Md.App. at 464–70, 630 A.2d 261, the New York case law dealing with the legal effect of the failure to give timely notice. That law established indisputably that New York takes a hard line approach and "takes a firm view regarding notice clauses in insurance contracts." 97 Md.App. at 464, 630 A.2d 261. The New York courts have "strictly enforced notice requirements and do not hesitate to relieve an insurer of its policy obligations when an insured fails to give timely notice of occurrence or notice of claim." *Id.* The right of "an insurer to receive notice has been held to be so fundamental that the insurer need show no prejudice." *Id.* New York has not hesitated to bar claims for

coverage "even when doing so has had a harsh economic effect on the insureds."

Our application of New York law to the litigation *sub judice* persuaded us that "Porter Hayden's notice to Commercial Union was not given within a reasonable time and, thus, was untimely as a matter of law." 97 Md.App. at 470, 630 A.2d 261. As a result, we reversed Judge Caplan's trial verdict in favor of Porter Hayden.

### E. Lack of Prejudice Under Maryland Law

Except to the limited extent that it claims that what is now Md. Ann.Code, Insurance Article, § 19–110, should not be applied retroactively, Commercial Union does not even argue that it would qualify for a disclaimer from coverage on the basis of untimely notice under Maryland law. Commercial Union has neither shown nor even proffered a scintilla of evidence to demonstrate that it was in any way prejudiced by the alleged lack of timely notice in this case. Its entire argument on the timely-notice-of-occurrence issue is that New York law should apply and that it should thereby be entitled to rely on the reasoning announced by this Court in reaching its decision in *Commercial Union v. Porter Hayden*, 97 Md. App. 442, 630 A.2d 261 (1993). But for the retroactivity issue, Commercial Union implicitly concedes that it could not prevail under present Maryland law.

 Unlike New York law, Maryland law does not now permit an insurer to disclaim coverage simply on the ground that the insured breached its policy obligation to give the insurer timely notice of an accident or occurrence. Maryland law requires the insurer to prove that it thereby suffered actual prejudice. The statute that effected the change in the Maryland law is now codified as Md.Code Ann., Insurance Article, § 19–110. It provides:

An insurer may disclaim coverage on a liability insurance policy on the ground that the insured or a person claiming the benefits of the policy through the insured has breached the policy by failing to cooperate with the insurer or by not

giving the insurer required notice *only if the insurer establishes by a preponderance of the evidence that the lack of cooperation or notice has resulted in prejudice to the insurer.*

(Emphasis supplied). That provision was formerly codified as Art. 48A, § 482. Any changes from the former provision to the present provision are only stylistic and do not affect substance.

. In direct response to a 1963 decision of the Court of Appeals, *Watson v. U.S.F. & G.,* 231 Md. 266, 189 A.2d 625, that had permitted an insurer to deny coverage even absent a showing of prejudice, the Legislature enacted Ch. 185 of the Acts of 1964, which became effective on June 1, 1964. In *State Farm v. Hearn,* 242 Md. 575, 582–83, 219 A.2d 820 (1966), Judge Oppenheimer discussed this change in the law and contrasted it with the preexisting law:

We deem it evident that the statute here involved affects substantive rights. Before the statute, the insurer was not liable to defend an insured, whether named or additional, under a policy if due notice was not given. Compliance with the policy provision by the assured was a condition precedent to the insurer's liability, whether or not the insurer was prejudiced. By the terms of the policy, before the statute, the insurer had a contractual right to deny liability if the conditions were not complied with, irrespective of prejudice.

*See also Home Indemnity v. Walker,* 260 Md. 684, 688, 273 A.2d 429 (1971); *Travelers Ins. Co. v. Godsey,* 260 Md. 669, 672–74, 273 A.2d 431 (1971); *Warren v. Hardware Dealers,* 244 Md. 471, 475–76, 224 A.2d 271 (1966).

In *Washington v. Federal Kemper Ins. Co.,* 60 Md.App. 288, 293, 482 A.2d 503 (1984), Judge Liss analyzed the diametric difference between the former law and the present law:

Prior to 1964, the rule in Maryland was that an insurer was not liable to defend the insured unless there was compliance by the insured with the policy requirement of notice of the accident and forwarding of the suit papers to

the insurer. Compliance with the policy provision was a condition precedent to the insurer's liability, whether or not the insurer was prejudiced. *Watson v. United States Fidelity and Guarantee [Guaranty] Co.,* 231 Md. 266, 189 A.2d 625 (1963).

In response to the Court of Appeals decision in *Watson,* the Maryland General Assembly enacted Chapter 185 of the Laws of 1964, effective June 1, 1964. This statute is now codified as Section 482 of Article 48A of the Maryland Code.

. . .

It is clear, therefore, that *the law in Maryland presently requires proof not only that the insured failed to provide the requisite notice* to the insurance company *but that the insurer suffered actual prejudice* from the insured's failure to comply with the policy requirements.

(Citation omitted; emphasis supplied).

In *General Accident Ins. Co. v. Scott,* 107 Md.App. 603, 613, 669 A.2d 773 (1996), Judge Hollander explicated the two hurdles that an insurer must clear before it may disclaim coverage on the ground that it did not receive reasonable notice from its insured:

In a case involving an insurer's allegation that its insured has forfeited coverage based on a failure to provide timely notice of the claim, the court must determine two issues: (1) whether the delay was, under all the surrounding circumstances, a reasonable one, *Lennon v. American Farmers Mutual Insurance Co.,* 208 Md. 424, 430, 118 A.2d 500 (1955); *American Casualty Co. v. Purcella,* 163 Md. 434, 437, 163 A. 870 (1933); and (2) *whether the insurer suffered any prejudice.* 8C John Appleman & Jean Appleman, Insurance Law and Practice § 5083.35 at 293–94 (1981). Whether a delay is reasonable depends on its length and the reason for it. Appleman, *supra,* § 5083.25 at 286–88 (1981); *State Farm Mutual Automobile Insurance Co. v. Burgess,* 474 So.2d 634 (Ala.1985). If the delay is reasonable, then the court's inquiry is at an end, because the insured's actions would not constitute a breach of the policy provision.

*If the delay is unreasonable, however, the insurer may avoid coverage only if it proves, by a preponderance of the evidence, that it suffered prejudice from the delay.*

(Emphases supplied).

In *Hartford Accident v. Sherwood,* 111 Md.App. 94, 110–11, 680 A.2d 554 (1996), Judge Salmon focused on the prejudice requirement:

> In order for an insurer to disclaim coverage based on late notice, *the insurer must establish by a preponderance of the evidence that the late notice resulted in actual prejudice to it.* Md.Code (1957, 1994 Repl.Vol.), Art. 48A, § 482. *See St. Paul Fire & Marine Ins. Co. v. House,* 315 Md. 328, 332, 554 A.2d 404 (1989). The insurer will survive summary judgment only if it raises a genuine dispute as to whether it was prejudiced by the delay in notice. *General Accident Ins., supra,* 107 Md.App. at 613, 669 A.2d 773. *Alleging only "possible, theoretical, conjectural, or hypothetical prejudice" is not enough. Id.* at 615, 669 A.2d 773. *The prejudice cannot be surmised or presumed from the mere fact of delay.*

(Emphasis supplied). *See also St. Paul Fire and Marine Ins. Co. v. House,* 315 Md. 328, 332, 554 A.2d 404 (1989).

Commercial Union attempts to avoid the foreclosing effect of the present Maryland law by claiming that the law, which became effective on June 1, 1964, may not be applied retroactively to affect substantive rights under policies that were written between 1941 and 1953. The 1964 law, however, did not affect those substantive rights. The substantive obligation of the insured, under the policies, to give timely notice of an occurrence to the insurer is unchanged. It exists post–1964 as surely as it did pre–1964. The change in the law only deals with the ancillary question of whether a breach by the insured of that unchanged policy obligation automatically entitles the insurer to disclaim coverage or does so only when the insurer can show prejudice from the breach.

It is the time of the breach of the contractual obligation to give timely notice that controls whether the old law affecting

the proof of the entitlement to a remedy for the breach or the new law affecting the proof of the entitlement to a remedy for the breach applies. The two Court of Appeals decisions that make this eminently clear are *State Farm v. Hearn,* 242 Md. 575, 219 A.2d 820 (1966), and *Warren v. Hardware Dealers,* 244 Md. 471, 224 A.2d 271 (1966).

In *Warren v. Hardware Dealers,* the question before the Court of Appeals concerned the breach of an insured's obligation, under the policy, to cooperate with the insured in the investigation and defense of the case rather than a breach of the obligation to give timely notice of the accident or occurrence. The effect of the 1964 law, imposing on the insurer the burden of showing actual prejudice, would be the same, however, regardless of the particular nature of the breach.

The liability insurance policy between the insured and the insurer in that case had been in existence at least as early as 1963, well in advance of the effective date of the new law. That, however, did not foreclose the applicability of the new law and its required showing of prejudice. The accident in that case occurred sometime prior to September 30, 1963, when the insured gave an investigator for the insurer a written statement describing the accident. The questionable cooperation of the insured with the insurer, sometimes adequate and sometimes inadequate, continued through August 28, 1964, approximately three months after the new law came into effect.

The trial judge ruled that the insurer was not obliged to provide a defense because of the failure of the insured to have lived up to his contractual obligation to cooperate with the preparation of the defense. The Court of Appeals reversed that trial court's ruling and remanded the case for a further hearing to determine whether, under the new law, the insurer had suffered actual prejudice:

> At the conclusion of the hearing the lower court ... ordered that the insurer was not obliged to defend the original action or pay a judgment resulting from the trial thereof.

·The basic question as to whether the decision of the lower court was premature necessarily depends on *whether the lack of cooperation on the part of the insured was such as to have resulted in prejudice to the insurer as of the time of the declaratory judgment hearing.*

244 Md. at 475, 224 A.2d 271 (Emphasis supplied).

The Court of Appeals held that the new law applied, that prejudice must be shown and that that prejudice could only be measured as of the time of trial. Notwithstanding that 1) the contract represented by the policy had been entered into and 2) the accident itself had occurred prior to the effective date of the new law, it was the ultimate breach of the obligation to cooperate that controlled the applicability of the new law. A showing of actual prejudice by the insurer was required:

> The statute, which became effective June 1, 1964, was held to affect substantive rights and to operate prospectively only in *State Farm Mutual Auto. Ins. Co. v. Hearn.*
>
> [W]e cannot say that what the insured did or did not do before June 1, 1964, justified invoking the policy provisions concerning the assistance and cooperation of the insured. *Nor can it be said that what occurred after the effective date of the statute was such as to establish that failure of the insured to cooperate had resulted in actual prejudice to the insurer.*

244 Md. at 477, 224 A.2d 271 (Emphasis supplied).

In *State Farm v. Hearn,* 242 Md. 575, 219 A.2d 820 (1966), the Court of Appeals held that the new law did not apply. The automobile liability insurance policy between the insured and the insurer had been in effect well in advance of the effective date of the new law. That, however, was not the dispositive fact in terms of its non-applicability. The facts that were dispositive were 1) that the automobile accident in the case had occurred on March 3, 1964 and 2) that suit had been filed against the insured on April 10, 1964. There was, under the policy, an obligation on the part of the insured 1) to give to the insurer notice of the accident *as soon as practicable* and 2) to forward the papers evidencing the suit *immedi-*

*ately.* Those were the critical dates for the accruals of obligations under the policy. Both preceded the effective date of the new law of June 1, 1964.

It was unclear whether the trial judge's decision to permit State Farm to disclaim coverage was 1) based on a determination that the statute was retroactive and that State Farm, therefore, could not avail itself of the entitlement to disclaim coverage because it did not show prejudice or 2) a finding that the notices ultimately given to the insurer had, indeed, been timely. The Court of Appeals concluded that if the *ratio decidendi* had been the first of those possibilities, it was erroneous:

> In this case, the accident occurred on March 3, 1964, suit was filed against Robert on April 10 and the statute did not become effective until June 1. *The substantive right of State Farm to notice in accordance with the policy had accrued before the statute came into effect.*

242 Md. at 583, 219 A.2d 820.

In any event, the controlling date for the applicability of the new law is, at the earliest, the date of the accrual of the substantive right to receive notice and not the date when the parties enter into a liability policy.

The accrual of Porter Hayden's obligation to give timely notice of occurrence to Commercial Union occurred, as we have held, in August of 1976. The possible breach of the policy obligation, if such a breach ever occurred, could not have occurred until sometime after August of 1976. Both the accrual of the obligation and the possible breach occurred over twelve years after the June 1, 1964 effective date of the new law requiring a showing of actual prejudice.[8] Absent such a showing, Commercial Union may not, under Maryland law,

---

8. Indeed, even the most favorable date that Commercial Union argued for—an accrual of the obligation to give notice as early as 1965—would have been a full year after the new law became effective in 1964. The date of an arguable breach, of course, would have been sometime even later.

disclaim coverage on the basis of allegedly untimely receipt of notice.

## F. The Choice of Law

The stakes are on the table. Under New York law, Commercial Union wins. Under Maryland law, Porter Hayden wins.

Judge Caplan initially, and then Judge Angeletti by adopting Judge Caplan's ruling as his own, determined, as a matter of law, that Maryland substantive law controlled this disclaimer of coverage issue. We will refer to this two-step process collectively as the "trial court's" determination. As a result of a significant change in Maryland's choice of law jurisprudence, the trial court's decision that Maryland substantive law controlled turned out, in hindsight, to have been correct—albeit for the wrong reason.

## G. *Lex Loci Contractus*

■ When the interpretation of an insurance policy and a choice of which state's law to apply has to be made, Maryland initially looks to the law of the state where the contract was entered into—the *lex loci contractus*. When this case was first before us, Judge Harrell succinctly set out this generally accepted state of the law:

> When presented with choice-of-law questions, Maryland courts generally follow the rule of *lex loci contractus*, which requires that *the construction and validity of a contract be determined by the law of the state where the contract was made. Allstate Ins. Co. v. Hart,* 327 Md. 526, 529, 611 A.2d 100 (1992); *Kramer v. Bally's Park Place, Inc.,* 311 Md. 387, 390, 535 A.2d 466 (1988); *Comstock Ins. Co. v. Thomas A. Hanson & Assocs., Inc..* 77 Md.App. 431, 438, 550 A.2d 731 (1988). For choice-of-law purposes, *a contract is made where the last act necessary to make the contract binding occurs. Sting Sec., Inc. v. First Mercury Syndicate, Inc.,* 791 F.Supp. 555, 558 (D.Md.1992); *Travelers Indem. Co. v. Allied–Signal, Inc.,* 718 F.Supp. 1252, 1253 (D.Md.1989).

Typically, "[t]he *locus contractus* of an insurance policy is *the state in which the policy is delivered and the premiums are paid."* *Aetna Casualty & Sur. Co. v. Souras,* 78 Md.App. 71, 77, 552 A.2d 908 (1989). *See also Sting Sec., Inc.,* 791 F.Supp. at 558 (citing *Aetna Casualty & Sur. Co.*); *Allstate Ins. Co. v. Hart,* 327 Md. 526, 529, 611 A.2d 100 (1992) (Maryland courts ordinarily apply the law of the jurisdiction where the contract was made); *Mutual Life Ins. Co. v. Mullan,* 107 Md. 457, 463, 69 A. 385 (1908) (insurance contract was made where premium was paid and policy was delivered).

97 Md.App. at 451–52, 630 A.2d 261 (emphases supplied).

The trial court and this Court reached very different conclusions in identifying the *lex loci contractus.* The trial court ruled that neither Commercial Union nor Porter Hayden had established where the relevant last act in the consummation of the contract had occurred. The trial court inferred, in the absence of clear evidence to the contrary, that the last necessary act occurred in Maryland, where the 1949 and 1950 policies were ultimately delivered to Porter Hayden's president at his headquarters in Baltimore. In his Decision and Order granting Partial Summary Judgment in favor of Porter Hayden, Judge Caplan reasoned:

Maryland law follows the *lex loci contractus* rule set forth in the Restatement (First) of Conflict of Laws; therefore, issues of contract construction are determined by "the local law of the place of contracting," which is defined as "the place where occurred the last act necessary under the forum's rules of offer and acceptance to give the contract binding effect...." Restatement (First) of Conflict of Laws § 332.

*Neither party to the litigation has been able to firmly establish where the relevant "last act" occurred.* From the record the Court could find that the last act occurred by delivery of the policies to the broker in New York or to the [Porter Hayden Company] president in Maryland.

In the absence of clear evidence to the contrary, *this Court will infer that the critical "last act" occurred in Maryland, upon the delivery of the policies to the president of the corporation.* The Court so finds.

. . .

For these reasons the Court will apply Maryland law to all of the issues in this case.

(Emphases supplied).

After noting that "none of the material facts relevant to this issue [was] in dispute," we held as a matter of law, that the *loci contractus* was New York:

We conclude that the trial court was clearly erroneous in reaching this factual inference that resulted in its determining that Maryland law governed this litigation. *See* Md. Rule 8–131(c). In our view, the evidence established that *the last act necessary to give the policy binding effect occurred in New York. That act was the delivery of the policies by ELAC's New York office to Porter Hayden's insurance broker in New York.*

97 Md.App. at 452, 630 A.2d 261 (emphasis supplied).

Judge Harrell's detailed analysis pointed out that the undisputed facts showed 1) the 1949 and 1950 policies were issued from Commercial Union's New York office; 2) that the fully executed policies were delivered to the New York office of Johnson & Higgins, Porter Hayden's insurance broker; 3) that the policy premiums were paid by Johnson & Higgins to Commercial Union in New York; and 4) that it was Porter Hayden's broker, Johnson & Higgins, that delivered the policies to Porter Hayden's president at his headquarters in Baltimore. Our concern in pinpointing the location of the last relevant act was clear:

In these circumstances, our inquiry focuses on whether the insurance contracts became binding upon ELAC's delivery to Johnson & Higgins in New York or upon Johnson & Higgins's delivery to Porter Hayden in Maryland. Determination of this issue turns on Johnson & Higgins's role at

the time it received the policies from ELAC: Was the broker an agent for the insured or the insurer? 97 Md.App. at 452–53, 630 A.2d 261.

We recognized that whether a broker represented the insurer or the insured is an *ad hoc* determination turning on the facts of each particular case. We also recognized that the general rule in Maryland and elsewhere is that a broker is the agent of the insured. 97 Md.App. at 453, 630 A.2d 261. A broker may, however, in some circumstances serve in a dual capacity, as an agent of the insured in procuring insurance but then as an agent of the insurer in delivering the policy and in collecting the premiums. *Id.* Under the uncontested facts of the present case, however, the broker was exclusively the agent of Porter Hayden:

> In the instant case, though, not only was there evidence that no consensual agency relationship existed between [Commercial Union] and Johnson & Higgins, but there was also uncontested evidence that Johnson & Higgins served as Porter Hayden's insurance agent from the 1940's to the 1960's. In a letter to Johnson & Higgins's New York office in 1985, Porter Hayden's counsel stated that "Johnson & Higgins served as insurance agent for [the Porter Hayden predecessor entities] for the period 1940 through 1964." In 1991, Porter Hayden's corporate designees, Mr. Charles W. Holtermann and Mr. Theodore O. Mannell, testified in depositions that they had no knowledge that was inconsistent with the statement in the 1985 letter that Johnson & Higgins acted as Porter Hayden's agent from 1940 to 1964. In addition, Howard S. Bush, a former [Commercial Union] employee from 1927 to the 1950's, testified that [Commercial Union] had no contractual or agency relationship with Johnson & Higgins during the period in question.

97 Md.App. at 453–54, 630 A.2d 261 (footnote omitted).

That being the case, our legal conclusion was clear the *lex loci contractus* was the law of New York:

> On the facts of the instant case, then, we conclude that the insurance policies became binding upon their delivery by

ELAC to Johnson & Higgins in New York. By virtue of Johnson & Higgins's continuous representation of Porter Hayden over an extended period of years, we believe that ELAC's mere entrusting of the delivery of the policies and collection of the premiums to Johnson & Higgins did not convert the broker to the status of agent for ELAC for these or any purposes. Johnson & Higgins retained its role as the insured's agent, and Commercial Union's delivery to Johnson & Higgins constituted delivery to the insured, Porter Hayden. *Because delivery took place in New York, each contract is deemed to have been made in New York. Accordingly, New York law governs the substantive law issues in this case.*

97 Md.App. at 455, 630 A.2d 261 (emphasis supplied). We held the conclusion of the trial court to the contrary to have been clearly erroneous. Accordingly, we reversed the decision of the trial court and held that Commercial Union, under the substantive law of New York, was entitled to summary judgment in its favor.

## H. *Renvoi* in Maryland Before *American Motorists v. ARTRA*

Both the trial court and this Court were of the mutual belief (we now know it to have been an erroneous belief) that once the state where the contract was consummated was identified, the substantive law of that state would control the interpretation of the contract (the policy).

Judge Harrell noted, however, that although the principal of *lex loci contractus* governed the resolution of the choice-of-law issue then before this Court, that principal was being eroded by a "modern" approach adopted by the Restatement (Second) of Conflict of Laws:

We acknowledge, however, that the application of the choice-of-law approach used by an increasing number of states, rather than *lex loci contractus,* may have resulted in a determination that Maryland law governs this case. Maryland's loyalty to *lex loci contractus* keeps it among the majority of jurisdictions that continues to follow that rule.

That majority, however, is shrinking. The rule has been criticized as mechanistic and inflexible. A growing number of states have abandoned *lex loci contractus* in favor of the more flexible "most significant relationship" test of the Second Restatement of Conflict of Laws. In these states, choice-of-law issues are decided by determining which state has the most significant contacts with the parties and the transaction.

97 Md.App. at 455, 630 A.2d 261. After outlining several factors that the Restatement suggests as aids to determine the state with the most significant contacts, we further noted:

With respect to casualty insurance contracts, the Restatement sets forth a more specific rule:

*The validity of a contract of* fire, surety, or *casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk* during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship ... to the transaction and the parties, in which even the local law of the other state will be applied.

Restatement § 193.

97 Md.App. at 456, 630 A.2d 261 (emphasis supplied).

We concluded that because the Restatement had not been adopted in Maryland, the unabated principle of *lex loci contractus* still governed and dictated the application of New York substantive law to the case. In *dicta,* however, we acknowledged:

[I]f Maryland were to adopt the approach advocated in § 193 Maryland law would govern in the instant case because the five plaintiffs in the underlying lawsuits alleged exposure to asbestos while they worked at Bethlehem Steel Plant in Sparrows Point, Maryland, apparently one of the insured locations under the CGL policy.

97 Md.App. at 457, 630 A.2d 261.

Judge Harrell then turned out to be a very percipient soothsayer:

The Court of Appeals may very well view the instant case as presenting an appropriate opportunity to reconsider Maryland's adherence to the place-of-contracting rule and adopt the Second Restatement's flexible approach. And the Court may determine that under such an approach Maryland law should govern this insurance coverage dispute. Until that time, however, we are bound to follow the law as it currently exists; changing the law in Maryland is the province of the Court of Appeals and the General Assembly. *Lex loci contractus* is old but not yet outdated, and remains the controlling law in this state.

97 Md.App. at 457–58, 630 A.2d 261.

## I. *Renvoi* in Maryland Since *American Motorists v. ARTRA*

Although this case did not turn out to be the vehicle for reconsidering Maryland's traditional adherence to the principle of *lex loci contractus*, a case that intervened between our *Commercial Union v. Porter Hayden*, 97 Md.App. 442, 630 A.2d 261 (1993) and the Court of Appeals decision in *Porter Hayden v. Commercial Union*, 339 Md. 150, 661 A.2d 691 (1995) did serve as a vehicle for such reconsideration.

In an unusual time configuration, the two-stage appellate process in that "vehicle" case completely "nested" within the two-stage appellate process of the present case. Judge Bloom's opinion for this Court in *ARTRA v. American Motorists*, 100 Md.App. 728, 642 A.2d 896 (1994), followed by a full year Judge Harrell's opinion in *Commercial Union v. Porter Hayden*. Our *ARTRA* relied in major measure on Judge Harrell's opinion as authority for the proposition that Maryland's version of *lex loci contractus* committed Maryland to applying the substantive contract and tort law of the foreign jurisdiction wherein the contract was finalized but stopped short of looking to and then applying the choice-of-law rules of that foreign jurisdiction. Maryland, in short, did not—at that time—apply principles of *renvoi*.

Before the Court of Appeals handed down its decision in the present case, however, it had already, a month earlier, filed its

decision in *American Motorists v. ARTRA,* 338 Md. 560, 659 A.2d 1295 (1995), reversing our *ARTRA* decision and dramatically changing the Maryland law with respect to *renvoi.* The supervening law on the subject of choice of law promulgated by *American Motorists v. ARTRA* not only required the reversal of our *ARTRA* decision but would also have required the reversal of our decision in *Commercial Union v. Porter Hayden,* had that decision not been vacated because the appeal was from a non-final judgment. Indeed, in *Porter Hayden v. Commercial Union,* the Court of Appeals sent us a very strong signal in that regard:

> Should additional disputes with respect to choice of law arise in the circuit court, we draw the attention of the parties to this Court's recent decision in *American Motorists Insurance Co. v. ARTRA Group, Inc.,* 338 Md. 560, 659 A.2d 1295 (1995).

339 Md. at 165 n. 12, 661 A.2d 691.

As the Court of Appeals in *American Motorists v. ARTRA,* prepared to reconsider the Maryland position on *renvoi,* it summarized the approach to the subject that this Court had taken in our *ARTRA* decision:

> The Court of Special Appeals held that the doctrine of *renvoi* was not accepted in Maryland, nor had Maryland accepted Restatement § 193's significant relationship analysis. The Court of Special Appeals held that Maryland followed the doctrine of *lex loci contractus* and that the Maryland court should therefore look to the *substantive* law of Illinois, but not to Illinois's choice-of-law rules.

338 Md. at 567, 659 A.2d 1295 (citation omitted; emphasis in original).

Judge Chasanow thoroughly reviewed the history, the philosophy, and the relative pro's and con's of the *renvoi* doctrine. He gave a nutshell description of its operation:

> The doctrine of *renvoi* is basically that, when the forum court's choice-of-law rules would apply the substantive law of a foreign jurisdiction to the case before the forum court, the forum court may apply the whole body of the foreign

jurisdiction's substantive law including the foreign jurisdiction's choice-of-law rules.

338 Md. at 574, 659 A.2d 1295.

■ In a case such as the one before us, if the forum state (Maryland) were 1) to look to the law, including the choice of law rules, of a foreign jurisdiction (New York) and 2) then to determine that New York, applying its choice of law rules, would refer the case back to Maryland, that is known, in the context of *renvoi* law, as a remission:

> If, in applying *renvoi* principles, the foreign jurisdiction's conflict of law rules would apply the forum's law, this reference back of the forum to its own laws is called a remission.

338 Md. at 574, 659 A.2d 1295.

The Court of Appeals then expressly changed the Maryland choice of law rules by adopting what it referred to as a "limited" version of *renvoi:*

> [W]e adopt a limited application of *renvoi* which permits us to apply Maryland law where the application of *lex loci contractus* indicates that the foreign jurisdiction would apply Maryland law to the substantive issues of the controversy.

338 Md. at 573, 659 A.2d 1295. The use of the modifying adjective "limited" may be taken with a grain of salt. It means merely that Maryland will avoid the absurd but hypothetically possible "Alphonse and Gaston" scenario wherein two equally deferential jurisdictions keep referring a case back and forth *ad infinitum.* Judge Chasanow explained:

> It has been suggested that *renvoi* could have the danger of creating an endless cycle. In the instant case, Maryland choice-of-law rules apply the doctrine of *lex loci contractus* and, pursuant thereto, apply Illinois law. In applying Illinois law, we also adopt Illinois choice of law, which would apply Maryland law, which applies Illinois law, and back and forth. What breaks the endless cycle? As shall be seen, we

adopt a limited form of *renvoi* in the instant case that does not have the endless cycle.

338 Md. at 574, 659 A.2d 1295.

Indeed, instead of committing Maryland to some minority position on *renvoi*, the "limited" application is the approach taken by most states that follow *renvoi* principles:

[I]t is suggested that the forum accept the reference to its own law, refer no further, and apply its own law. This is the practice of most jurisdictions that do employ renvoi.

338 Md. at 575, 659 A.2d 1295.

 Maryland basically continues to adhere to the doctrine of *lex loci contractus*. When the choice of law rules of that contracting state, to wit, that part of the *lex loci contractus*, would itself apply Maryland law, we accept that remission:

Under this exception, Maryland courts should apply Maryland substantive law to contracts entered into in foreign states' jurisdictions in spite of the doctrine of *lex loci contractus* when:

1) Maryland has the most significant relationship, or, at least, a substantial relationship with respect to the contract issue presented; and

2) The state where the contract was entered into would not apply its own substantive law, but instead would apply Maryland substantive law to the issue before the court.

338 Md. at 579, 659 A.2d 1295.

Judge Chasanow explained why such a position makes eminently good sense:

Where ... the place of contracting applies Maryland law, then simplicity, predictability, and uniformity would be better achieved if Maryland courts followed the conflict of law rule of the place of contracting and apply Maryland law....

The limited *renvoi* exception which we adopt today will allow Maryland courts to avoid the irony of applying the law

of a foreign jurisdiction when that jurisdiction's conflict of law rules would apply Maryland law.

338 Md. at 579, 659 A.2d 1295.

## J. New York's Choice of Law

■ Applying New York's choice of law rules, it is clear to us that New York would consider Maryland to have had "the most significant relationship" to the liability policies in question and to be, moreover, the "principal location of the insured risk." As a state that basically subscribes to the Second Restatement of Conflict of Laws, including §§ 188 and 193, New York would apply the law of Maryland.

In a decision that actually anticipated the position ultimately taken by the Court of Appeals in *American Motorists v. ARTRA*, Judge J. Frederick Motz, in *Travelers Indem. Co. v. Allied–Signal, Inc.*, 718 F.Supp. 1252, 1253–54 (1989), applied what he believed to be Maryland choice-of-laws rules and ultimately applied Maryland law, notwithstanding that the places where the contracts had been made binding were New York and New Jersey:

> Maryland generally follows the *lex loci contractus* rule under which a contract is construed according to the laws of the state "where the last act is performed which makes an agreement a binding contract." *Under that rule, New York or New Jersey law would be controlling.*
>
> [I]t is appropriate for a Maryland court to look to the law of the state whose law is applicable under the *lex loci contractus* doctrine to determine if that state would refer back to Maryland law for decision on the substantive issues presented.
>
> . . .
>
> *The conflicts laws* both *of New York* and of New Jersey *would result in the application of the law of Maryland as the state having the most substantial interest in the outcome of the litigation.*

(Emphases supplied; citations and footnote omitted). *See also Steinbach v. Aetna Cas. & Sur. Co.*, 81 A.D.2d 382, 440

N.Y.S.2d 637 (1981) (New York applies laws of principal location of insured risk and state most intimately concerned with litigation's outcome); *Puro International of New Jersey Corp. v. California Union Ins. Co.*, 672 F.Supp. 129 (S.D.N.Y. 1987).

In *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 618 N.Y.S.2d 609, 642 N.E.2d 1065 (1994), the Court of Appeals of New York articulated New York's choice-of-law principles:

Historically, courts faced with a choice of law question in contract cases applied the law of the State where the contract was made or was to be performed (*see* Restatement of Conflict of Laws § 370). However, as the flaws in mechanical application of these rigid rules became apparent, our Court developed more flexible approaches to choice of law questions. In *Auten v. Auten*, 308 N.Y. 155, 124 N.E.2d 99, we inaugurated the use of "center of gravity" or "grouping of contacts" as the appropriate analytical approach to choice of law questions in contract cases.

*The purpose of grouping contacts is to establish which State has "the most significant relationship to the transaction and the parties "* (*see* Restatement [Second] of Conflict of Laws § 188[1] ). The Second Restatement, in addition to the traditionally determinative choice of law fact or of the place of contracting, offers four other factors to be considered in establishing this "most significant relationship" the places of negotiation and performance; the location of the subject matter; and the domicile or place of business of the contracting parties.

618 N.Y.S.2d at 612, 642 N.E.2d at 1068 (emphasis supplied). The Court in *Zurich* went further in citing its approval of the Restatement (Second) of Conflicts to such choice of law questions:

Beyond these general contract principles, however, the Second Restatement also separately addresses *that special subset of contracts that involves insurance,* and takes the position that *where liability insurance contracts are con-*

*cerned, the applicable law is "the local law of the state which the parties understood was to be the principal location of the insured risk* * * * unless* with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties" (*see* Restatement [Second] of Conflict of Laws § 193).

*Id.,* 618 N.Y.S.2d at 613, 642 N.E.2d at 1069 (Footnote omitted; emphasis supplied). *See also Regional Import & Export Trucking Co. v. North River Ins. Co.,* 149 A.D.2d 361, 539 N.Y.S.2d 940, 941 (1989).

In a frantic effort to discount the precedential impact of the *Zurich v. Shearson Lehman* case, Commercial Union points out that the New York Court of Appeals ultimately applied New York law notwithstanding the Second Restatement of Conflict of Laws. It did, to be sure, but only because of the strong public policy forbidding insurers to indemnify for purely punitive damages. The guidelines announced in the Second Restatement ordinarily control New York's choice of law but those ordinary guidelines may be "trumped" by public policy considerations:

> The question is whether New York's public policy precluding indemnification for punitive damages should prevail over the public policies of the judgment States, which allow indemnification.

618 N.Y.S.2d at 610, 642 N.E.2d at 1066. Absent the "trumping" consideration, New York follows the Second Restatement.

 Indeed, in the case of *In re Payroll Express Corp.,* 921 F.Supp. 1121, 1125 (S.D.N.Y. 1996), the United States District Court for the Southern District of New York summarized New York's choice of law rules with respect to insurance agreements. It referred specifically to the *Zurich v. Shearson Lehman* case as authority for New York's commitment to § 193 of the Restatement Second and to the focus on "the principal location of the insured risk":

> New York's choice of law rule governing insurance agreements is to apply " 'the local law of the state which the

parties understood was to be the principal location of the insured risk ... unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties.'" *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.* (quoting *Restatement (Second) of Conflict of Laws* § 193 (1971)).

(Citation and footnotes omitted). In an effort to deflect the significance of § 193 and "the principal location of the insured risk," Commercial Union asserts that that consideration has no pertinence where the liability policy covers risks in multiple jurisdictions. We do not agree. We subscribe to the position stated by Judge Harrell in *Commercial Union v. Porter Hayden,* 97 Md.App. 442, 456, 630 A.2d 261 (1993):

Some insurance policies, like the CGL policy in the instant case, cover risks located in several states. In these multiple-risk situations, the authorities adopting the Restatement approach have treated such policies, with respect to the risks in a particular state, as if a separate policy had been issued to cover only the risks in that state.

Maryland is indisputably the jurisdiction with the most significant relationship to the insurance coverage in issue. Porter Hayden, in the manifestation of one of its predecessors, is a Maryland corporation that has conducted business in Maryland continuously since 1924. The Commercial Union underwriter who issued the first policy to Porter Hayden in 1934 testified that Porter Hayden's operations at that time were centered in and around Maryland. It is also undisputed that Maryland is "the principal location of the insured risk." The majority of the lawsuits against Porter Hayden have been filed in Maryland by plaintiffs who are Maryland residents who allege injury in Maryland. The five claims directly involved as the subject of the present lawsuit alleged asbestos exposure by persons working at the Bethlehem Steel Plant in Sparrows Point. Indeed, we anticipated this very conclusion in *Commercial Union v. Porter Hayden,* 97 Md.App. at 457, 630 A.2d 261:

[I]f Maryland were to adopt the approach advocated in § 193 Maryland law would govern in the instant case because the five plaintiffs in the underlying lawsuits alleged exposure to asbestos while they worked at the Bethlehem Steel Plant in Sparrows Point, Maryland, apparently one of the insured locations under the CGL policy.

Commercial Union contends that because the alleged breach of contract is based upon "late notice," it engages the gears of a strong New York public policy in that regard:

That "late notice" is the issue as to which the putative conflict of laws in this case arises even further enhances the weight a New York court would accord the place of contracting factor, given New York's strong and often-articulated policy of enforcing the right of insurers to require strict adherence by insureds to policy-imposed conditions.

(Footnote omitted). It ignores the case of *Regional Import & Export v. North River*, 149 A.D.2d 361, 539 N.Y.S.2d 940 (1989). In that case, the Appellate Division held that New Jersey law rather than New York law applied to the dispute, notwithstanding that the alleged breach of contract was one charging a two-year delay in the giving of notice. That was not deemed to be a sufficient consideration to keep the case in New York.

■ Commercial Union grasps at one final straw. It points to "Condition 19" in the policies, which provides:

*Terms of Policy Conformed to Statute.* Terms of this policy which are in conflict with the statutes of the state wherein this policy is issued are hereby amended to conform to such statutes.

Commercial Union boldly asserts that that provision stands for the proposition that Commercial Union and Porter Hayden contractually agreed to adopt New York law as controlling. We are dumbfounded that anyone could read that conclusion into that provision. It is clearly nothing more than a standard "conformity clause" intended simply to ensure that the policy will not be rendered invalid by failing to comply with the laws of the state in which it is issued. A quick reading of the

several cases cited by Commercial Union to support its assertion that Condition 19 is a choice-of-law clause reveals that they are neither factually nor legally apposite.

Indeed, this Court has already concluded in *Commercial Union v. Porter Hayden* that the parties did not enter into a contractual choice of law provision. In distinguishing § 187 of the Second Restatement from §§ 188 and 193, Judge Harrell stated:

> But the situation for which § 187 is intended—where the parties have selected a particular state's law to govern their rights and duties under the contract—is *not the situation present in the case sub judice. In the absence of a contractual choice-of-law provision, as is the case here,* § 188 (or § 193 when a fire, surety, or casualty insurance contract is involved) would be the applicable rule in a jurisdiction that has adopted the Restatement.

97 Md.App. at 457, 630 A.2d 261 (Emphasis supplied). We continue to subscribe to that position.

It is ironic that Commercial Union argues that both it and Porter Hayden (or their predecessors) intended for New York law to control any policy interpretation. New York law includes, of course, New York's choice-of-law rules. Even if Maryland had not been involved in this litigation and even had New York been the forum state *ab initio,* New York, applying §§ 188 and 193 of the Second Restatement of Conflict of Laws, would have applied the insurance contract law of Maryland.

Accordingly, we hold that the trial court 1) was not in error in denying Commercial Union's Motion for Summary Judgment based on the Statute of Limitations and 2) was not in error in granting Porter Hayden's Motion for Summary Judgment notwithstanding the defense based on limitations.

### *The Nature of the Coverage*

Commercial Union contends that Judge Caplan initially, and then Judge Angeletti in adopting Judge Caplan's rulings as his own, erred in determining that Porter Hayden enjoyed cover-

age for the asbestos-related claims because the policies only provided coverage for third party bodily injury liability occurring during Porter Hayden's operations, i.e, "premises-operations" coverage. Commercial Union argues that the asbestos-related claims against Porter Hayden are all, in essence, products liability claims because they deal with the hazards posed by a product, and thus, would only be covered if "products hazard" coverage had been purchased, which Porter Hayden concedes had not been purchased.

Commercial Union, however, is putting the cart before the horse. It is anticipating the ultimate issue of an actual duty to indemnify rather than focusing on the more intermediate and tentative issue of a potential duty to indemnify. Only the ultimate trial on the merits of the individual claims of asbestos-related injury can determine whether the injury occurred as a result of a mere exposure to hazardous products or as a more direct result of Porter Hayden's installation operation while it still had control of a particular premises. The immediate issue of a duty to defend hinges only on the possibility or potentiality of that latter situation.

The pivotal question is whether the asbestos-related claims presented the *potentiality* of being covered by the "premises-operations" policies. The Court of Appeals has succinctly set forth the proper focus:

> Our cases hold that the obligation of an insurer to defend its insured under the provisions of a contract of insurance is determined by the allegations in the tort action. Thus, if the plaintiff in the tort suit alleges a claim covered by the policy, the insurer has a duty to defend. Even if a tort plaintiff does not allege facts which clearly bring the claim within the policy coverage, the insurer still must defend if there is a *potentiality* that the claim could be covered by the policy.

*Lloyd E. Mitchell, Inc. v. Maryland Casualty,* 324 Md. 44, 62 n. 4, 595 A.2d 469 (1991)(emphasis in original). The duty to defend exists "even though 'the claim asserted against the insured cannot possibly succeed because either in law or in

fact there is no basis for a plaintiff's judgment.' " *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 408–09, 347 A.2d 842 (1975). Indeed, "[u]nder the potentiality rule, the insurer will be obligated to defend more cases than it will be required to indemnify because the mere possibility that the insurer will have to indemnify triggers the duty to defend." *Litz v. State Farm Fire & Casualty Co.*, 346 Md. 217, 695 A.2d 566 (1997).

> *Brohawn* and its progeny make clear that any potentiality of coverage, no matter how slight, gives rise to a duty to defend. The potentiality rule, in this regard, is perhaps better labeled the "possibility rule," and courts have characterized it as such. The defense obligation extends even to those claims filed in bad faith for the sole purpose of raising a potentiality of coverage.

*Litz*, at 226, 695 A.2d at 570 (quoting Andrew Janquitto, *Insurer's Duty to Defend in Maryland*, 18 U. Balt.L.Rev. 13–14 (1988)(footnote omitted)). Our focus is not on whether Commercial Union will ultimately have to indemnify Porter Hayden but rather on *whether it appears at this time that there is even a potential or a possibility that it will have to do so.*

To determine whether such a potential for coverage exists, the allegations made in the plaintiff's complaint must be examined. *Litz*, at 226, 695 A.2d at 570; *Brohawn*, 276 Md. at 407, 347 A.2d 842. On examination of the asbestos-related claims that have been filed in this case, there is no question that the potential exists that Commercial Union might have to indemnify. The "Schedule of Operations," which was appended to the policies, classified Porter Hayden's operations for the purpose of the "premises-operations" policies, as "Asbestos Insulation" and "Insulation Work." The five asbestos-related lawsuits that are the subject of this dispute assert claims premised upon strict liability, breach of warranty, negligence, fraud, civil conspiracy, market share liability, loss of consortium, and wrongful death. All of those individual lawsuits are merely "short-form complaints" that adopt and incorporate by reference pertinent paragraphs contained in a single Master Complaint.

In the Master Complaint, the following "general" allegations, among others, were made:

4. Over the course of years, Plaintiff was employed at various shipyards in and around Maryland, ... **and was required to work with and around asbestos products** whereby he was exposed to and did inhale and/or ingest asbestos fiber and dust **released from Defendant's** asbestos products and **activities.**

5. **Defendants,** and each of them as listed above, at all times relevant and pertinent hereto were engaged in the business of mining and/or milling and/or manufacturing and/or fabricating and/or supplying and/or selling and/or **installing** and/or removing asbestos and asbestos-containing products (hereafter "asbestos products").

. . .

7. **Defendants** sold, supplied, delivered, designed, manufactured, **installed,** removed, or otherwise transferred or disturbed **asbestos products that emitted asbestos fiber and dust.**

8. During the pertinent periods, **the Plaintiff was exposed** to and did inhale and/or ingest asbestos fibers and dust of, and/or **released by, the Defendants.**

(Emphases supplied).

As to negligence, which is Count Two of the Master Complaint, the following allegations, among others, were made:

28. **Defendants knew,** or in the exercise of reasonable care should have known, that their asbestos products and **activities posed a serious threat to life and health.**

29. **Defendants knew,** or in the exercise of reasonable care should have known, **that person employed as was the Plaintiff would be required to and would,** in fact, **come into contact with and work in close proximity to Defendants'** asbestos products or **the asbestos dust and fiber emitted by their activities.**

30. **Although Defendant knew or should have known that individuals such as the Plaintiff were being exposed to their inherently hazardous asbestos products and the**

asbestos dust caused by their activities, the Defendants, and each of them, willfully, wantonly, and with gross disregard for the safety of Plaintiff negligently, recklessly, and carelessly omitted and failed to:

(a) Warn, or adequately warn, the Plaintiff of the hazards inherent in working with or around and inhaling dust from Defendants' asbestos products, or released by Defendants' activities;

(b) Warn, or adequately warn, the Plaintiff that protective equipment should be used when working with or around Defendant's asbestos products, or nearby Defendants' activities;

(c) Place warnings, or sufficient warnings, on the containers of the asbestos products or near the areas of their activities and to advise the bystanders and handlers thereof regarding the dangers of exposure of asbestos fiber or dust.

(d) Warn, or adequately warn, the Plaintiff of the greatly increased hazard posed by the use of cigarettes by one who is, or has been exposed to asbestos dust or fiber.

31. Defendants, in wanton and reckless disregard for human life and health, were negligent, and grossly negligent, in the development, design, installation, removal, manufacture, marketing, testing, and handling of these asbestos products in ways which include, but are not limited to, their failure to:

(a) Take reasonable precautions or exercise reasonable care to publish, adopt, follow, and communicate safety plans and safe methods of handling, installing and removing asbestos products;

(b) Package and contain said asbestos products in a manner to lessen or eliminate the inhalation of asbestos fiber by those installing or removing, or those in proximity to those installing or removing, asbestos products.

(c) Design, develop, and distribute asbestos-free substitutes for their asbestos products and to discontinue asbestos product production altogether;

(d) **Test to determine the effects on those individuals who were exposed to dust emitted during installation** and/or removal of Defendants' asbestos products;

(e) Acknowledge and make reasonable responses to the literature that has been available since the 1920's regarding the hazards of inhaling and/or ingesting asbestos dust or fiber.

32. As a proximate result of the Defendants' negligence, recklessness, and gross indifference to life, **Plaintiff inhaled and/or ingested asbestos fibers and dust from the** asbestos products and activities **of Defendants** and thereby contracted asbestos disease.

(Emphases supplied).

From those selected portions of the Master Complaint, it is evident that Porter Hayden could be held liable for the manner in which it conducted *its operations in installing* the asbestos-containing products. In that light, it is not solely covered by the "Products Hazard" insurance it declined to purchase. The "Products Hazard" insurance covers claims and liabilities relating to:

(1) the handling or use of, the existence of any condition in or a warranty of goods or products manufactured, sold, handled or distributed by the named insured ... **if the accident occurs after the insured has relinquished possession thereof to others and away from premises owned, rented or controlled by the insured ...; (2) operations, if the accident occurs after such operations have been completed or abandoned at the place of occurrence thereof....**

(Emphasis supplied).

The "Products Hazard" insurance is concerned with injury occurring after possession of the goods or the product has been relinquished or the operation has been completed or abandoned. The nature of some of the allegations in the

Master Complaint, however, concern exposure and injury occurring during the operation, such as the emission of asbestos dust during the installation process.

We affirm the ruling of Judge Angeletti that, as a matter of law, there is a potentiality that the asbestos-related claims are covered and that there is, therefore, a duty on Commercial Union to defend and, depending on the ultimate findings on the merits, potentially to indemnify.

## The Post–Verdict Issues

Following the jury's rendition of its verdict on January 17, 1996, several post-verdict issues arose. The jury had determined 1) that the nine "missing policies" existed and 2) that the content of the "missing policies," written on standard comprehensive liability policy forms, was substantially the same as that of the two extant policies. The first two post-verdict issues required a legal interpretation of the undisputed terms of the policies.

## The Policy Limits:
### The Meaning of "Per Accident" or "Per Occurrence"

None of the policies (neither the two extant policies nor the nine missing policies nor the 60–day "stub" policy) contained any aggregate upper limit on the total coverage of the entire policy. They all, however, contained sub-provisions establishing maximum coverage limits on 1) a "per person" basis and 2) on a "per accident" or later a "per occurrence" basis.

The common denominator question involved in this contention, coincidentally, is not concerned with the changeover in phraseology from "per accident" to "per occurrence" that apparently took place in 1948. That distinction should not be permitted to distract us. As a technical matter, the seven missing policies covering the period of November 25, 1941 through November 24, 1948 contained the "per accident" language. The first four had a "$10,000 per accident" limit and the next three had a "$100,000 per accident" limit. Al-

though the printed policy forms apparently continued to contain the phraseology "per accident" even after 1948, endorsements to the two extant policies, covering the periods 1948–49 and 1949–50, substituted the term "occurrence" for the term "accident." This linguistic calibration was apparently an industry-wide phenomenon. The jury found, moreover, that the last two missing policies (1950–51 and 1951–52 plus the "stub" policy) also contained endorsements substituting "occurrence" for "accident." After November 25, 1950, the policies contained coverage limits of "$300,000 per occurrence."

■ The issue before us is whether 1) each claimant who was injured by exposure to asbestos constituted a separate "occurrence" (or "accident") or 2) Porter Hayden's "decision" to install asbestos-containing insulation during a policy period was itself a single "occurrence" (or "accident"), regardless of how many persons may have been injured as a result of that single "occurrence." The latter interpretation could well have the practical effect of establishing an aggregate coverage limit for an entire policy.

On January 29, twelve days after the jury verdict, Porter Hayden moved for partial summary judgment declaring that each claimant who alleged injurious exposure to asbestos as a result of Porter Hayden's operations constituted a separate "occurrence" (or, earlier, a separate "accident") for purposes of determining the coverage limits of a policy. According to Porter Hayden's motion, the motion was triggered by a conversation with Commercial Union's counsel revealing Commercial Union's intention to argue that there was but one "occurrence" or "accident" in each policy period and that that single monolithic "incident" was Porter Hayden's "decision" to install the asbestos-containing insulation materials. Commercial Union, to be sure, denied that any such conversation ever took place. The issue itself, however, is a very legitimate one regardless of what caused it to arise at the moment it did.

Judge Angeletti's final Amended Order Granting Plaintiff Porter Hayden Company's Motion for Entry of Final Judg-

ment, issued on May 13, 1996, included the following sub-declaration:

> The "per accident" or "per occurrence" limits of liability provided by each third party liability policy issued by Defendant to the Plaintiff, as reflected in Porter Hayden's existing policies and in the special verdict of the jury, at a minimum, apply separately to each claimant who alleges injurious exposure to Porter Hayden's operations during an applicable policy year.

Commercial Union contends that that interpretation is erroneous. Initially, it is clear that the construction of the terms of a policy is a function of the trial judge as a matter of law. *Sullins v. Allstate Ins. Co.*, 340 Md. 503, 508, 667 A.2d 617 (1995); *Chantel Assoc. v. Mt. Vernon Fire Ins. Co.*, 338 Md. 131, 142, 656 A.2d 779 (1995). It is, moreover, clear that if the meaning of a policy term is ambiguous and no extrinsic or parol evidence is introduced, the ambiguity will "be construed against the drafter of the instrument." *Sullins v. Allstate,* 340 Md. at 508–09, 667 A.2d 617.

There is an absolute dearth of appellate case law dealing with the meaning of "occurrence" or "accident" in the context of establishing policy limits in asbestos personal injury litigation. There is, however, a *nisi prius* decision of significantly persuasive authority. In one of the most important asbestos-related insurance coverage cases yet decided, Judge Ira Brown of the San Francisco Superior Court ruled that each individual claim for asbestos-related injuries constituted a separate "occurrence" for which policy limits are applicable. *Asbestos Insurance Coverage Cases,* Judicial Council Coordination Proceeding No. 1072, Statement of Decision Concerning Phase IV Issues (San Fran. Sup.Ct. January 24, 1990), at 9–16. Although the decision of Judge Brown was affirmed in part under the name *Armstrong World Indus. v. Aetna Cas. & Sur. Co.*, 35 Cal.App.4th 192, 26 Cal.Rptr.2d 35 (1993), that part of Judge Brown's decision dealing with the meaning of "occurrence" was not the subject of the appeal.

We find the reasoning of Judge Brown, at p. 16 of his opinion, to be highly persuasive:

The common thread running through the California cases is that an "occurrence" or "accident" is associated with the time of injury. This leads to the conclusion that the "cause" of injury which determines the number of occurrences undoubtedly refers to the immediate rather than the remote cause of injury. As the court stated in *Maples [v. Aetna Casualty and Surety Co.], supra*, 83 Cal.App.3d [641] at pp. 647–648, 148 Cal.Rptr. 80 [(1978)], in reference to both California and out-of-state cases on the timing of "occurrences" or "accidents":

[T]his seemingly unbroken line of authority find[s] that the term "accident" unambiguously refers to the event causing damage, not the earlier event creating the potential for future injury. . . .

The event causing damage in the asbestos-related bodily injury cases is exposure to asbestos fibers (See Phase II Decision at pp. 29–30). Since each individual claimant has a unique work history, each claimant's exposure must be viewed as a separate occurrence.

We hold that the interpretation by Judge Angeletti of the phrases "per occurrence" and "per accident" as they bear on policy limits was not in error.

### *A False Distinction:*
### *"Occupational Disease" Versus "Bodily Injury"*

 Following the jury verdicts of January 17, 1996, Commercial Union on January 29 moved, on the basis of those verdicts, for partial summary judgment with respect to the seven "missing" policies covering the time period of November 25, 1941 through November 24, 1948. The jury had found that those seven policies had used the phrase "per accident" in establishing coverage limits, whereas all subsequent policies had, by way of endorsements, substituted the phrase "per occurrence" for the phrase "per accident." Commercial Union moved for partial summary judgment with respect to those

seven policies on the ground that "the underlying asbestos-related claims were not caused by 'accident' as required by" the seven policies in question. Commercial Union contends that in granting a final judgment in favor of Porter Hayden with respect to all policies, Judge Angeletti *sub silentio* denied its motion of January 29 and did so erroneously.

Although momentarily perplexing, Commercial Union's position is without ultimate merit. It cites a number of Maryland opinions, to be sure, that have described asbestos-related ailments as "occupational diseases." It cites a number of Maryland cases, also to be sure, that have treated "occupational diseases," on the one hand, and "personal bodily injuries caused by accident," on the other hand, as mutually exclusive categories. It concludes therefrom that liability policies that cover only "accidents" do not cover "occupational diseases" as a category, even if the occupational diseases were caused by exposure to asbestos.

The body of case law cited is substantial: *Davis v. Dyncorp.*, 336 Md. 226, 647 A.2d 446 (1994); *Lettering Unlimited v. Guy*, 321 Md. 305, 582 A.2d 996 (1990); *Montgomery County v. McDonald*, 317 Md. 466, 564 A.2d 797 (1989); *Lowery v. McCormick Asbestos Co.*, 300 Md. 28, 475 A.2d 1168 (1984); *Lovellette v. Mayor and City Council of Baltimore*, 297 Md. 271, 465 A.2d 1141 (1983); *Shifflett v. Powhattan Mining Co.*, 293 Md. 198, 442 A.2d 980 (1982); *Foble v. Knefely*, 176 Md. 474, 6 A.2d 48 (1939); *Gunter v. Sharp and Dohme*, 159 Md. 438, 151 A. 134 (1930); *Victory Sparkler & Specialty Co. v. Francks*, 147 Md. 368, 128 A. 635 (1925).

Every one of those cases, however, is taken from the very special and statutory world of Workers' Compensation law. It is a body of law that is not concerned with fault or liability coverage based on fault; it is concerned with whether certain forms of disability were job-related. Although job-related injury and job-related disease are slowly evolving toward a single compensable phenomenon, their respective histories have been widely divergent. That divergence has produced a

number of linguistic anomalies that are peculiar to Workers' Compensation law.

When provision for workers injured on the job was first made part of the statutory law of Maryland by Ch. 800 of the Acts of 1914, the initial purpose was to cover highly visible and dramatic accidents. The new law dealt with situations in which cause-and-effect was an indivisible and instant phenomenon—a finger or an arm chopped off or mangled by a piece of industrial machinery. What we now think of as the Workers' Compensation Commission was initially the State Industrial Accident Commission. In those simple beginnings, easily established accidental injuries were compensable. Compensation for more subtle and less visible occupational diseases had to await a more sophisticated time. That time came when the General Assembly, by Ch. 465 of the Acts of 1939, enacted the Occupational Disease Amendment to the Workers' Compensation Act. The category of compensable occupational diseases initially was limited to a special schedule of specially enumerated diseases. In 1951, it was broadened to include any case of "an employee's becoming actually incapacitated, either temporarily or permanently, partially or totally, because of [a] disease contracted as the result of and in the course of employment." *See generally* J. Nicholas Shriver, Jr., *The Maryland Occupational Disease Law,* 4 Md. L.Rev. 133 (1940).

Even after Workers' Compensation law expanded to include occupational diseases, however, it treated the cases of accidental bodily injury and occupational disease in very different fashions. In *Montgomery County v. McDonald,* 317 Md. 466, 564 A.2d 797 (1989), Judge Rodowsky points out how the two compensable phenomena have 1) different triggering events for the statute of limitations, 2) different times within which the employee must make a report to the employer, 3) different times within which the employer must file a report with the Commission, and 4) reached different results on the question of whether the failure of an employer to file a report will toll the statute of limitations.

In *Lovellette v. Mayor and City Council of Baltimore*, 297 Md. 271, 465 A.2d 1141 (1983), the Court of Appeals had to deal with a situation in which a firefighter suffered a heart attack as the direct result of immediate sudden strenuous activity. The Medical Board considered the heart attack to have been "accidental in nature." If the disability had been categorized as resulting from an accidental injury, the firefighter would have received a lesser amount of compensation. If, on the other hand, it were characterized as an occupational disease, he would have qualified for "compensation benefits under the financially more beneficial occupational disease provisions." 297 Md. at 275, 465 A.2d 1141. The amount of compensation depended on which of two mutually exclusive categories was to be used.

In a number of ways, the jerry-built nature of the statutory scheme for handling the two forms of job-related disability has created this definitional bi-polarity that is peculiar to Workers' Compensation law. Any definition of "occupational disease" plucked from the roiled waters of Workers' Compensation law should, therefore, be handled with extreme caution. In *Davis v. Dyncorp.*, 336 Md. 226, 236–37 n. 7, 647 A.2d 446 (1994), Judge Chasanow well analyzed the tricky linguistic problem:

> The amicus brief submitted on behalf of various workers' compensation payors in Maryland relies heavily upon *the judicial definitions of "occupational disease"* contained in *Foble v. Knefely*, 176 Md. 474, 486, 6 A.2d 48, 53 (1939) and *Victory Sparkler*, 147 Md. at 379, 128 A. at 638–39. Although these definitions may be of some assistance, *they should not be unduly relied upon.* As Professor Larson has explained, *"[d]efinitions of 'occupational disease' should always be checked against the purpose for which they were uttered."* 1B Arthur Larson, *Workmen's Compensation Law* § 41.31, at 7–361 (1987). Larson distinguishes between definitions created for the purpose of "defeating compensation because an injury is 'not an accident but an occupational disease' in jurisdictions which had at the time of the decision no occupational disease coverage," *id.* (*i.e., Foble* and *Victory Sparkler*), and those created to

allow "awards for occupational disease under general definitions of the term, as against the contention that the disease is an ordinary nonindustrial illness." *Id.* Professor Larson believes that *"[i]t is of little value, and, indeed, may be quite misleading, to quote indiscriminately from old definitions, whose only purpose was distinguishing accident."* *Id.* § 41.32, at 7–367.

(Emphases supplied). It is to be noted that the cases of *Foble v. Knefely* and *Victory Sparkler* directly commented on by Judge Chasanow were two of the cases on which Commercial Union relied heavily in its Memorandum in support of its Motion for Partial Summary Judgment on this issue.

Commercial Union, moreover, seeks to make too much of the difference between the earlier usage "per accident" and the post-1948 usage "per occurrence." The change in phraseology seems clearly to have been made only in order to make explicit what had theretofore already been implicit and thereby to avoid the very type of confusion giving rise to the present contention. B. Ostrager and T. Newman, *Handbook on Insurance Coverage Disputes,* § 8.03(a) (8th ed.1995), points out:

> The purpose of amending the standard CGL [comprehensive general liability] form from an "accident" based policy to an "occurrence" based was to *confirm* that the insured event was *not* limited to sudden events, but *also* included personal injuries ... sustained as the result of gradual processes, or as the result of repeated exposures to the same or similar conditions.

(Emphases supplied).

The claims against Porter Hayden charged it, *inter alia,* with negligence in its installation operations and its failure to give adequate warnings. That such negligence may constitute an "accident" was made very clear by Judge Chasanow in *Sheets v. Brethren Mut. Ins. Co.,* 342 Md. 634, 652, 679 A.2d 540 (1996):

> Although our prior cases may have been less than clear in explaining the relevant inquiry, we hold today that *an act of*

*negligence constitutes an "accident" under a liability insurance policy* when the resulting damage was " 'an event that takes place without [the insured's] foresight or expectation.' " In other words, *when a negligent act causes damage that is unforeseen or unexpected by the insured, the act is an "accident" under a general liability policy.*

We concur with the courts that have held that construing the term "accident" as including negligent acts resulting in unexpected or unforeseen damages conforms to the meaning that a " 'reasonably prudent layperson would attach to the term.' " We agree that this approach is "most in accord with the reasonable expectations of the average purchaser of general liability insurance in the light of the contract language."

(Emphasis supplied; citations omitted).

 Even if "occupational disease" and "personal bodily injury as a result of an accident" are mutually exclusive terms in Workers' Compensation law, that mutual exclusivity by no means carries over into general tort law. In any event, the inhalation of asbestos fibers is indisputably a personal bodily injury whether or not it is also an occupational disease. *Lloyd E. Mitchell, Inc. v. Maryland Casualty Co.*, 324 Md. 44, 46, 595 A.2d 469 (1991), made that indisputably clear as it "focuse[d] upon the event or events which trigger insurance coverage under a standard form comprehensive general liability insurance policy in the context of asbestos-related personal injuries."

The analysis of Chief Judge Murphy made it very plain that if "occurrence" and "accident" are not precise synonyms, they are nonetheless largely overlapping terms and they include "continuous or repeated exposure to conditions which result in bodily injury":

[T]he standard form comprehensive general liability insurance policies here involved require Maryland Casualty to pay on behalf of the insured "all sums which the insured shall become legally obliged to pay as damages because of ... bodily injury ... caused by an occurrence." The policy

defines an "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury ... neither expected nor intended from the standpoint of the insured." It is thus clear from these provisions that coverage turns on the happening of an "occurrence" during the policy period, which results in "Bodily Injury," a term defined in the policy in the disjunctive as (1) bodily injury, or (2) sickness, or (3) disease. 324 Md. at 57, 595 A.2d 469. After surveying the case law around the country, the Court of Appeals emphatically held that bodily injury occurs whenever asbestos is inhaled and retained in the lungs:

Considering the plain meaning of the term "bodily injury," as used in the policy, and in light of the medical evidence concerning the development of asbestos-related diseases, we align ourselves with the overwhelming weight of authority in the country and conclude that *"bodily injury" occurs when asbestos is inhaled and retained in the lungs. ... [A]t a minimum, coverage under the policy to provide a defense and indemnification of the insured is triggered upon exposure to the insured's asbestos products during the policy period by a person who suffers bodily injury as a result of that exposure.*

324 Md. at 62, 595 A.2d 469 (emphasis supplied).

We hold that Judge Angeletti was not in error in denying Commercial Union's Motion for Partial Summary Judgment in this regard.

### The Award of Attorneys' Fees

Commercial Union's third contention challenging post-verdict rulings claims that Judge Angeletti was in error in awarding to Porter Hayden attorneys' fees and costs in the amount of $646,785.94. The award did not include Porter Hayden's attorneys' fees incurred either in establishing the existence of the "missing policies" or in litigating the appeal. Those deductions from Porter Hayden's total attorneys' fees will be considered when we turn attention to one of the two contentions raised by Porter Hayden in its cross-appeal.

■ With respect to the award of $646,785.94 made by Judge Angeletti on May 13, 1996, Commercial Union complains that it was based on an inadequate factual record. We agree with Commercial Union that when claims for attorneys' fees and expenses are, as in this case, claimed as damages for a breach of contract, the plaintiff must satisfy the standards spelled out in *Bankers and Shippers Ins. Co. v. Electro Enterprises, Inc.*, 287 Md. 641, 415 A.2d 278 (1980), and *Maxima Corp. v. 6933 Arlington Development Ltd. Partnership*, 100 Md.App. 441, 641 A.2d 977 (1994). *Bankers* held that when faced with an award of attorneys' fees in a case such as this, the insurer is "entitled to have the amount of fees and expenses proven with the certainty and under the standards ordinarily applicable for proof of contractual damages." 287 Md. at 661, 415 A.2d 278. *Maxima* elaborated on that requirement in expansive detail:

> Other jurisdictions have delineated the detail required and the quantum of information that the prevailing party must provide. The overwhelming authority holds that (a) the party seeking the fees, whether for him/herself or on behalf of a client, always bears the burden of presenting evidence sufficient for a trial court to render a judgment as to their reasonableness; (b) an appropriate fee is always reasonable charges for the services rendered; (c) a fee is not justified by a mere compilation of hours multiplied by fixed hourly rates or bills issued to the client; (d) a request for fees must specify the services performed, by whom they were performed, the time expended thereon, and the hourly rates charged; (e) it is incumbent upon the party seeking recovery to present detailed records that contain the relevant facts and computations undergirding the computation of charges; (f) without such records, the reasonableness, *vel non*, of the fees can be determined only by conjecture or opinion of the attorney seeking the fees and would therefore not be supported by competent evidence.

100 Md.App. at 453–54, 641 A.2d 977.

■ We hold, however, that Porter–Hayden eminently satisfied those rigorous standards of proof. This was not a

case, as in *Bankers*, in which "the informal hearing conducted by the trial court neither required any real proof of the amount of the fees and expenses claimed nor provided *Bankers* with a realistic opportunity to challenge those fees and expenses." 287 Md. at 661, 415 A.2d 278. Nor was this a case, as in *Maxima*, in which the insured "submitted below only a very cursory schedule of those attorneys' fees that included the rate charged, the number of hours worked, and the dates that work was performed." 100 Md.App. at 455, 641 A.2d 977.

Judge Caplan considered the question of attorneys' fees and rendered a decision as to them as early as February 14, 1992. He amended that order as of March 12, 1992. Following the trial on remand, Porter Hayden filed on January 26, 1996 its final request for attorneys' fees and costs. Judge Angeletti conducted three full days of hearings on the nature and the reasonableness of the fees. Various witnesses from the law firm of Whiteford, Taylor and Preston testified at length and in precise detail with respect to the type and the quantity of the legal work performed during the then six years of litigation. Judge Angeletti had submitted to him and he reviewed numerous invoices and spreadsheets detailing the fees and expenses incurred by Porter Hayden at each stage of the litigation. The transcript of testimony on this issue, the legal memoranda, and the numerous exhibits consumed slightly over one thousand pages of the record extract.

Before issuing his Amended Order of May 13, 1996, Judge Angeletti had, on May 7, delivered a detailed opinion from the bench. He made extensive findings of fact:

A review of the Court record as well as all of the proceedings and all of the evidence reveals that this matter required the highest and the utmost of legal skill, knowledge and a variety of resources in order to properly prepare and present this case.

This case has been very heavily litigated. The Court will not adopt the word used by counsel. I believe the word was contentious, (but every T was crossed), every dotting of an I

was the subject of inquiry, and every step of the process involved motions, counter motions, research memoranda, searching for documents, not just in this jurisdiction, but in California, the hiring of corresponding counsel in California for purposes of obtaining necessary information to properly present this case, the use of the attorneys in the plaintiff's law firm of Whiteford, Taylor and Preston was appropriate.

The firm has developed unusual expertise and skill in handling the most difficult and sensitive of litigation. The ability of the parties who were involved, the attorneys, the paralegals, and corresponding counsel has not been challenged.

The time devoted to this matter, as has been stated by counsel, was full time, and while Ms. Kershner may not have spent eight hours a day, eight days a week on this issue, it is clear that the time spent based on a review of the records clearly indicates that she relinquished her other responsibilities to her firm and assumed full responsibility under Mr. Close's supervision for the prosecution of this most important litigation.

There were filed answers and counterclaims, productions—requests for production of documents, opposition to the requests for production of documents, motion to strike offenses and defenses, motions to withdraw, motion for declaratory relief, first amended motion, opposition to motion to withdraw original answers, response to motion to place record under seal, response to production of documents, motion to stay counterclaim, opposition to the motion to stay counterclaim, opposition to the motion to substitute, motion to stay counterclaim pending arbitration, motion to seal records, memorandum of law and all of those issues, motion for summary judgments by the defendants, claims that the claims are within products hazard as opposed to the allegation of the plaintiff, motion for summary judgment, many hearings on those motions, motions for sanctions.

. . .

Needless to say that each side was represented by superbly able and capable counsel. Neither side giving any quarter.

Some effort was made by the defense during the course of this hearing to suggest that certain battles were not prevailed in by the plaintiff.

However, as the Court pointed out, a battle is a necessary part of an overall war and it is not for the plaintiff to pick and choose which battles they would engage in or which battles they would prevail in.

The overall purpose of the litigation was to obtain the defendant's compliance with the contractual obligation and that was achieved.

In ruling that Porter Hayden was entitled to recover its reasonable costs and attorneys' fees in bringing and maintaining its declaratory judgment action, Judge Angeletti detailed the evidence that he had reviewed:

Upon Plaintiff Porter–Hayden Company's motion for recovery of its reasonable costs and attorneys' fees incurred in bringing and maintaining this declaratory judgment action through December 31st, 1995, as set forth in its motion for entry of final judgment and having considered the defendant's response thereto and Porter–Hayden's reply, the following hearings thereon conducted on February 9th, May 3rd, and May 6th, 1996, the following review of the evidentiary material and testimony submitted to the Court during said hearings consisting of inter alia Plaintiff's Exhibits A through G introduced by Porter–Hayden in support of its motion for entry of final judgment and in support of its request for reimbursement of costs and attorneys' fees through December 31st, 1995, invoices for costs and attorneys' fees submitted by Whiteford, Taylor and Preston, to Porter–Hayden for payment, documentation of payment of said invoices by Porter–Hayden, additional documents and summaries provided to the Court during hearings on May 3rd and 6th, 1996, and testimony by plaintiff's counsel in this matter, the Court finds and concludes that Porter–

Hayden is entitled to recover its reasonable costs and attorneys' fees occurred in bringing and maintaining this declaratory judgment action ...

His findings specifically included his conclusion that the costs and fees had been fair and reasonable:

And, further, finds the above stated costs and fees incurred by Porter–Hayden were incurred for legal services and expenses which were reasonably necessary to bring and maintain this action through and including December 31st, 1995.

And, further, that the amount of said costs and fees incurred by Porter–Hayden are fair and reasonable.

With respect to the award of attorneys' fees and expenses that was actually made to Porter Hayden, we see no error and we affirm the ruling of Judge Angeletti in that regard. To the extent the award may have been too limited, we will consider that question when we turn our attention to the claim made in that regard in Porter Hayden's cross-appeal.

### Porter Hayden's Cross–Appeal

By way of cross-appeal, Porter Hayden raises the two contentions:

1. that the trial court erroneously failed to award it attorneys' fees and costs incurred in 1) proving the existence and content of the nine "missing policies" and 2) defending the appeal to this Court and prosecuting the further appeal to the Court of Appeals; and

2. that the trial court erroneously held that Porter Hayden's coverage claims with respect to claims made against it between January 1, 1987 and September 20, 1987 were barred by the Statute of Limitations.

### The Two Reductions From the Award of Attorneys' Fees and Costs

Although always in danger of being obscured by the mountainous detail that has accumulated in this case, the salient facts are these: Porter Hayden paid premiums and

purchased comprehensive general liability insurance from Commercial Union for the period of eleven years and two months that ran from November 25, 1941 through January 24, 1953. In 1987, Porter Hayden submitted claims to Commercial Union for defense and possible indemnification under the policies for those eleven years. Commercial Union denied that Porter Hayden enjoyed coverage for those claims. Porter Hayden instituted a declaratory judgment action to establish that it enjoyed potential coverage and that Commercial Union was therefore obligated to provide a defense to the claims. Although it has taken ten years to reach this point, this Court is in this opinion holding that Commercial Union is, indeed, obligated to defend and potentially to indemnify under the policies.

 The basic law in this regard was well stated by Judge Karwacki for the Court of Appeals in *Nolt v. U.S.F. & G.*, 329 Md. 52, 66, 617 A.2d 578 (1993):

> The rule in this State is firmly established that when an insured must resort to litigation to enforce its liability insurer's contractual duty to provide coverage for its potential liability to injured third persons, the insured is entitled to a recovery of the attorneys' fees and expenses incurred in that litigation.

In *Bankers and Shippers Ins. Co. v. Electro Enter.*, 287 Md. 641, 648, 415 A.2d 278 (1980), Judge Eldridge made it clear that the category "litigation to enforce its liability insurer's contractual duty to provide coverage" includes a declaratory judgment action to determine such coverage:

> [T]his Court has held that an insurer is liable for the damages, including attorneys' fees, incurred by an insured as a result of the insurer's breach of its contractual obligation to defend the insured against a claim potentially within the policy's coverage, and this is so whether the attorneys' fees are incurred in defending against the underlying damage claim or *in a declaratory judgment action to determine coverage and a duty to defend.*

(Emphasis supplied). *See also Continental Casualty Co. v. Bd. of Education,* 302 Md. 516, 537–38, 489 A.2d 536 (1985); *Brohawn v. Transamerica Ins. Co.,* 276 Md. 396, 415, 347 A.2d 842 (1975); *Gov't Employees Ins. Co. v. Taylor,* 270 Md. 11, 22, 310 A.2d 49 (1973); *Cohen v. American Home Assurance Co.,* 255 Md. 334, 350–63, 258 A.2d 225 (1969); *B.G.E. v. Commercial Union Ins. Co.,* 113 Md.App. 540, 577–78, 688 A.2d 496 (1997); *Aetna Ins. Co. v. Aaron,* 112 Md.App. 472, 502, 685 A.2d 858 (1996); *Maxima Corp. v. 6933 Arlington Development,* 100 Md.App. 441, 453, 641 A.2d 977 (1994); *Campbell v. Allstate Ins. Co.,* 96 Md.App. 277, 294, 624 A.2d 1310 (1993); *American Home Assurance Co. v. Osbourn,* 47 Md.App. 73, 83–84, 422 A.2d 8 (1980).

As the prevailing party in this declaratory judgment action, Porter Hayden is entitled to be reimbursed by Commercial Union for all fair and reasonable attorneys' fees and expenses incurred in the course of this litigation. The trial court has determined that the fees and costs proffered by Porter Hayden with respect to all phases of this litigation were fair and reasonable. Generally speaking, those attorneys' fees and expenses have been awarded to Porter Hayden.

There were, however, two significant exemptions from that award. Porter Hayden was not awarded the $148,963.92 in attorneys' fees and costs incurred in establishing the existence and the substance of the "missing policies." Porter Hayden was not awarded the $136,492.50 in attorneys' fees and costs incurred in pursuing the appeals, first to this Court and then to the Court of Appeals. We will consider each of these reductions from the total award separately.

## A. The "Missing Policies" Litigation

In his initial Order of February 14, 1992, Judge Caplan directed that Porter Hayden be awarded all fair and reasonable attorneys' fees and expenses incurred in pursuing the litigation to that point. Commercial Union moved to have him modify that Order by subtracting that portion of the attorneys' fees and costs incurred in establishing the existence and the content of the missing policies. After a hearing on

that Motion on February 28, Judge Caplan granted the Motion and filed an Amended Order on March 12, which provided:

> Defendant owes to Plaintiff all of Plaintiff's reasonable attorneys' fees costs incurred in bringing and maintaining this declaratory judgment action, *excluding all fees relating to Plaintiff's proof of its claims concerning the existence, terms and conditions of missing policies, and excluding all costs and fees relating to the deposition of Mr. Bush taken on December 19, 1991.*

(Emphasis supplied). Judge Caplan's Order in that regard of March 12, 1992 was ultimately adopted by Judge Angeletti on May 13, 1996.

We believe that Judge Caplan's decision was based on a misreading of the law. The distinction he seemed to be making was not, as it should have been, one based on whether Porter Hayden ultimately was entitled to coverage. The distinction, rather, seemed to be between a case in which the insurer's denial of coverage is a reasonable and justifiable, even if ultimately invalid, tactic and a case in which a denial of coverage is outrageously implausible. In articulating his rationale on February 28, Judge Caplan found Commercial Union's denial of coverage reasonable when Porter Hayden could not provide it with copies of the missing policies:

> [T]he Defendant, Commercial Union, has a very strong argument in that there is an allegation by the Plaintiffs that it breached, the Defendants breached, an obligation to provide coverage, but there [were] no policies that were presented to them that they could produce, and, therefore, the Court believes, after studying this, it would be unfair to assess to Commercial Union the cost of providing the policies in existence.

■ Judge Caplan also seemed to find significant the fact that a key witness on the missing policies question was only produced by Porter Hayden late in the game:

> [A]s late as December of last year, Mr. Bush, who was, I think everybody would have to admit, a key witness in this

case, was deposed by you, Mr. Close and Ms. Kershner, and that evidence was very strong in the Court's mind in the determination of this entire lost policies issue and that was very late in the game.... [T]hat being the case the Court is of a mind, unless I am dissuaded otherwise, to take away the fees, attorney's fees and costs that PHC has expended and not make that a damage that would be collectable by you.

. . .

[I]f you don't have the policies and you can't give them to them, you can't expect them to provide coverage without seeing those and ... knowing what they are. Even though the evidence I believe at a later time clarified that, I think Mr. Bush added a great deal of strength to PHC's argument. Therefore, that was such a late time in the game that a lot of those arguments would not have been as strong as they were to the Court's mind but for Bush's testimony.

Judge Caplan, in finding Commercial Union's denial of coverage to have been reasonable, seemed to equate the scantiness of proof of the policies with the non-existence of the policies:

[T]he Court believes that Commercial Union *could not have breached something which was not in existence and needed to be proved,* and the piecing together of that information and the reconstruction of those policies, which 1 know took you all a long time, can't be shifted over to Commercial Union to, in my mind at least, expense-wise or cost-wise, and one of my main reasons was that Bush was late and strong.

(Emphasis supplied). The nine policies, of course, were not non-existent; only the "best evidence" of them was non-existent. The policy is not the piece of paper it is written on. The paper is simply evidence of the policy.

In a sense, the misreading of the law by Judge Caplan was understandable. The Court of Appeals decision of *Nolt v. U.S.F. & G.,* 329 Md. 52, 617 A.2d 578 (1993), had not yet been promulgated. Judge Caplan announced his rationale for the reduction of the award on February 28, 1992. The most

recent exposition of law on the subject at that time was our decision of *U.S.F. & G. v. U.S. Fire Ins. Co.*, 90 Md.App. 327, 600 A.2d 1178 (1992), which had just been filed twenty-four days earlier on February 4, 1992. It was our decision that was ultimately reversed by the Court of Appeals *sub nom. Nolt v. U.S.F. & G.* It was the latest word on the subject as of February 28, however, and counsel unquestionably brought it to the attention of Judge Caplan.

In our decision, we held that an insurer denying coverage is not always required to pay the attorneys' fees of the insured in a declaratory judgment action, if the facts present "a very close case" and the tactical decision to deny coverage seems, therefore, to have been justified. In *U.S.F. & G. v. U.S. Fire,* we had said, 90 Md.App. at 348–49, 600 A.2d 1178:

> [I]n *Maryland Auto Ins. Fund v. Sparks, supra* [42 Md. App. 382, 400 A.2d 26 (1979)], we held that, *despite a finding that the insurer owed the insured a duty to defend, the insured was not required to pay the insured's attorney fees in the declaratory judgment action due to the "facts of this case which provide a very close question* for determination by the fact finder." Similarly, here the question of whether or not Nolt was covered even by the excess provision of the U.S.F. & G. policy was a *"very close question for determination by the fact finder."* There was a conflict in Summers' and Nolt's recollection of their conversation as to Nolt obtaining Summers' permission to drive the truck for others. The jury chose to believe Nolt; but *the decision could have gone either way on this issue. Thus it well may be that U.S.F. & G.'s refusal to provide even excess coverage was justified.*

(Emphases supplied).

In reversing the decision of this Court, *Nolt v. U.S.F. & G.* flatly repudiated the notion that the existence of a "very close question for determination" could ever justify the denial of coverage or foreclose the entitlement of the insured to an award of attorneys' fees expended in establishing coverage:

The Court of Special Appeals acknowledged that rule but, in *dicta*, suggested that it was not applicable, reasoning that U.S.F. & G. was justified in breaching its contract to provide coverage because the issue of whether Nolt was a permissive user of the truck he had leased to Summers was a "very close question for determination by the fact finder." 329 Md. at 67, 617 A.2d 578. Close question or not, the insured was entitled to attorneys' fees and expenses:

On remand, the trial court will assess those damages and *include all attorney fees and expenses incurred by Nolt in connection with the previous proceedings* in the circuit court, with those on remand, and with the proceedings in the Court of Special Appeals and in his Court.

329 Md. at 68, 617 A.2d 578 (Emphasis supplied).

■ The entitlement of an insured to attorneys' fees and costs incurred in establishing contested coverage depends exclusively on whether that coverage is ultimately determined to exist. It does not depend on whether the denial of coverage by the insurer was reasonable or unreasonable, justified or unjustified, a close question of fact or a matter not even subject to legitimate dispute. The focus is exclusively on the bottom line.

In the cross-appellee's brief on this issue, Commercial Union makes a statement that perplexes us and that we hope was not intended to mislead:

When PH tendered the five underlying claims in August of 1987 on which its Complaint is based, PH neither referred to nor demanded a defense under the "missing policies." Nor did CU deny a defense under any alleged "missing" policy.

Is that suggesting that there was no claimed coverage for nine of the eleven years for which premiums were paid? For that statement, Commercial Union refers back to the August 31, 1987 letter from Porter Hayden's attorneys to Commercial Union, alerting it to the five new 1987 claims. That letter referred generically to "the insurance coverage to be afforded to Porter Hayden by Commercial Union under the various policies written by Commercial Union." It certainly did not

imply that no coverage was being claimed under nine of the eleven policy years. If the letter did not refer to "missing policies" in those terms, neither did it refer to any particular "non-missing" policies. It did not specifically identify any of the eleven policies by year or other characteristic and we are not sure what Commercial Union is suggesting in this regard. The letter simply referred to the entire eleven-year period of coverage as an entity. At that time, there did not yet exist any distinction between two of the eleven policies that were "extant" and nine of the eleven policies that were "missing."

We hold that the trial court, Judge Caplan initially and then Judge Angeletti in adopting Judge Caplan's position, was in error in denying Porter Hayden's attorneys' fees and expenses for that part of the litigation involved in proving the existence and the content of the missing policies. Porter Hayden was entitled to all attorneys' fees and expenses incurred in proving the existence of eleven years of coverage. The "missing policies" sub-issue was simply part of that larger proof.

## B. The Appellate Litigation

It was the May 13, 1996 Amended Order of Judge Angeletti that determined that Porter Hayden was not entitled to the $136,492.50 in attorneys' fees and expenses incurred during the appellate proceedings, notwithstanding his finding that the amount was fair and reasonable. We hold that the Order in that respect was in error. None of the case law establishing the entitlement of an insured to the attorneys' fees incurred in establishing coverage suggests any distinction between litigation at the trial level and litigation at the appellate level. Indeed, the *Nolt* case itself directed the trial court to assess all attorneys' fees and expenses incurred by Nolt in connection with

> the previous proceedings in the circuit court, with those on remand, *and with the proceedings in the Court of Special Appeals and in this Court.*

(Emphasis supplied).

Commercial Union argues in this regard that "Porter Hayden lost the appeal in this Court, and neither side

prevailed in the Court of Appeals" and concludes therefrom that "Porter Hayden simply was not a prevailing party in either appellate proceeding." That fact, of course, is immaterial. To be sure, the insured must be the prevailing party to be entitled to the award of attorneys' fees. In deciding the entitlement to attorneys' fees incurred in establishing contested coverage, however, we do not determine which party was the "prevailing party" on an inning-by-inning basis, but only at the end of the entire game. For the moment at least, the filing by the Court of this opinion is the end of the game and Porter Hayden has emerged as the prevailing party.

 Another statement made by Commercial Union in pursuing this argument turns out to be immaterial: "The Court of Appeals expressly directed: 'Costs in this Court and in the Court of Special Appeals to be equally divided.'" The Court of Appeals mandate clearly referred only to the modest fiscal assessment of court costs—such things as filing fees. It does not purport to suggest anything with respect to dividing equally such other things as attorneys' fees and expenses incurred in that appellate litigation. Indeed, the settled law enunciated by the Court of Appeals over the years has always been that the entitlement of an insured to recover court costs and expenses incurred in litigating challenged insurance coverage depends on the ultimate determination on the merits with respect to such coverage. The dismissal of the appeal by the Court of Appeals for the reason that the merits had not yet been finally litigated self-evidently recognized that any determination with respect to Porter Hayden's attorneys' fees and expenses would have to await the ultimate disposition of the case on its merits.

These proceedings, from the first filing of the declaratory judgment action on September 21, 1990 through the filing by this Court of this opinion, is a single, indivisible litigation. Porter Hayden prevailed at the trial level in 1992. It was Commercial Union that took the appeal to this Court, attempting to upset the declaration of coverage that had been made in Porter Hayden's favor. The determination by the Court of

Appeals that the judgment appealed from was not yet final settled nothing with respect to the ultimate merits and simply ordered a remand so that the litigation of the merits could continue. We hold that the total amount of attorneys' fees and costs incurred by Porter Hayden in bringing and maintaining this action through December 31, 1995, an amount determined by Judge Angeletti to be $954,088.16, should have been awarded to Porter Hayden.

With respect to the request of Porter Hayden that we "remand this action to the trial court for award of the reasonable fees and expenses incurred by Porter Hayden since December 31, 1995," we are unable to discern any indication that that issue was ever raised before the trial court. Accordingly, there is nothing before us to review. We are not suggesting that it would be inappropriate for the question to be posed to the trial court. It is simply not for us gratuitously to say what the parties may or should do by way of wrapping up this litigation when it concerns an issue that is not formally before us for our review.

### The Statute of Limitations:
### Claims Between January 1 and September 20, 1987

The second of the two contentions raised by Porter Hayden on cross-appeal is that the trial court erroneously ruled that the Statute of Limitations barred coverage for any claims filed against Porter Hayden between January 1 and September 20, 1987, other than the five underlying claims in this declaratory judgment action. For the reasons fully analyzed as we discussed Commercial Union's primary contention with respect to the Statute of Limitations, we hold that Porter Hayden's contention on cross-appeal is well taken. We hold that the Statute of Limitations does not bar coverage for claims between January 1 and September 21, 1987.

Before leaving entirely the subject of the Statute of Limitations, we are constrained to make one observation. There appears to have been some imprecision in identifying the particular legal proceeding that was allegedly barred by the

Statute of Limitations. Commercial Union's Motion for Summary Judgment, which was initially denied on February 14, 1992, was directed at the Declaratory Judgment action itself, as Commercial Union claimed that "the parties' insurance coverage dispute [had been] ripe for adjudication" for "a decade or more" as of the time the request for the Declaratory Judgment was filed on September 21, 1990.

No distinction seems to have been made between 1) the proposition that the entire Declaratory Judgment proceeding itself was time-barred and 2) the very different proposition that as part of the result of a timely considered Declaratory Judgment there should have been an affirmative declaration a) that certain claims of coverage would be time-barred or b) that breaches-of-contract suits for the denial of coverage of all, none, or some underlying claims would be time-barred. The second proposition concerns the substantive merits of a Declaratory Judgment; the first proposition, by contrast, holds that the merits should not even be considered.

At times it seemed as if all parties (including the court) were wandering back and forth across the lines that should have separated one of those propositions from the other without apparent awareness that boundary lines even existed. The focus was not clear. There was only one Statute of Limitations motion before the trial court. In the course of handling that motion, however, two or three possible objects of a Statute of Limitations attracted shifting attention. No one seemed to be "turning square corners" as that random shifting took place.

By what alchemy the February 14 threshold determination as to whether the Declaratory Judgment action itself was time-barred could be transmuted into the March 12 substantive declaration as to whether certain claims of coverage were time-barred, we are still not certain. A motion challenging the entire proceeding as an action barred by the Statute of Limitations is not the appropriate vehicle for challenging the substantive merits of what the Declaratory Judgment, if not time-barred, might declare.

### *The Motion to Dismiss*

Porter Hayden moved for a dismissal by this Court of the appeal because of a violation of Maryland Rule 8–602(a)(5), which provides:

(a) **Grounds.**—On motion or on its own initiative, the Court may dismiss an appeal for any of the following reasons:

. . .

(5) the record was not transmitted within the time prescribed by Rule 8–412, unless the court finds that the failure to transmit the record was caused by the act or omission of a judge, a clerk of court, the court stenographer, or the appellee.

Rule 8–412(a)(1) and (d), in turn, provide:

(a) **To the Court of Special Appeals**—Unless a different time is fixed by order entered pursuant to section (d) of this Rule, the clerk of the lower court shall transmit the record to the Court of Special Appeals within sixty days after:

(1) the date of an order entered . . . pursuant to Rule 8–206(c) following a prehearing conference, unless a different time is fixed by that order, in all civil actions specified in Rule 8–205(a).

(d) **Shortening or Extending the Time.**—On motion or on its own initiative, the appellate court having jurisdiction of the appeal may shorten or extend the time for transmittal of the record.

In its turn, Rule 8–206(c) and (d), dealing with prehearing conference procedures, provide:

(c) *Scheduling conference.* The purpose of a scheduling conference is to discuss the contents of the record and record extract, the time or times for filing the record and briefs, and other administrative matters that do not relate to the merits of the case.

(d) *Order.* On completion of any conference conducted under this Rule, the judge shall enter an order reciting the actions taken and any agreements reached by the parties.

A prehearing conference was held in this case before Chief Judge Alan M. Wilner. At that conference, the parties agreed to a briefing schedule. By Order of August 20, 1996, Judge Wilner directed that the record in this case be transmitted to the Clerk's Office of the Court of Special Appeals by September 23, 1996.

It is undisputed that the Clerk's Office of the Baltimore City court received a copy of Judge Wilner's Order. The September 23 deadline, however, was not met. The sworn affidavit of John S. Hrica, Supervisor of the Appeals Section of the Clerk's Office of the Baltimore City Circuit Court, stated that the record "was not transmitted to the Court of Special Appeals by September 23, 1996, because this Office overlooked Paragraph 2 of the Honorable Alan M. Wilner, Chief Judge's Prehearing Conference Order dated August 20, 1996." We find controlling in this regard the holding of the Court of Appeals in *Uhler v. Real Properties, Inc.* 289 Md. 7, 21, 421 A.2d 966 (1980):

> *If the existence of excusing conditions asserted in the motion for extension is not controverted, or, if controverted, it appears to the Court of Special Appeals that the delay was occasioned by the neglect,* omission or inability of a judge *of* that court, *the clerk of the lower court,* the court stenographer or the appellee, *then the appeal cannot be dismissed for failure to transmit the record within the time prescribed.*

(Emphases supplied). Accordingly, we deny the Motion to Dismiss the Appeal.

We note that Porter Hayden claimed that it has been "caused real prejudice" by the delay in the transmittal of the record because that delay deferred the due date of Commercial Union's brief from October 23 to December 31. The claimed prejudice is that Commercial Union thereby "was afforded two additional months to polish its brief." In view of the ultimate outcome of this appeal, Porter Hayden may wish to rethink that claim of prejudice.

**720**

*DECLARATORY JUDGMENT MODIFIED SO THAT AWARD TO PORTER HAYDEN OF ATTORNEYS' FEES AND EXPENSES SHALL INCLUDE FEES AND EXPENSES INCURRED IN LITIGATING BOTH THE "MISSING POLICIES" QUESTION AND THE APPEALS; DECLARATORY JUDGMENT FURTHER MODIFIED TO ELIMINATE PROVISION THAT CLAIMS FILED BETWEEN JANUARY 1, 1987 AND SEPTEMBER 20, 1987 WERE BARRED BY THE STATUTE OF LIMITATIONS; AS MODIFIED, THE DECLARATORY JUDGMENT IN FAVOR OF PORTER HAYDEN IS AFFIRMED; COSTS TO BE PAID BY COMMERCIAL UNION.*